**BRUCKNER-MITCHELL, Inc., v. SUN INDEMNITY CO. OF NEW YORK et al.***

No. 6409.

United States Court of Appeals for the District of Columbia.

Decided Jan. 20, 1936.

*Certiorari denied 56 S. Ct. 941, 80 L. Ed. ——.

Fontaine C. Bradley, of Washington, D. C., for appellant.

William F. Kelly and P. J. J. Nicolaides, both of Washington, D. C., for appellees, Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America and Guardian Casualty Company.

Christopher B. Garnett, of Washington, D. C., for appellee, United States Casualty Company.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This case is here upon an appeal from a decree of the Supreme Court of the District of Columbia dismissing, upon motion of the appellees, defendants below, the bill of complaint and amendment thereto of the appellant, the plaintiff below. The appellant is Bruckner-Mitchell, Inc., a corporation of New York. The appellees are the United States Casualty Company, Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America, and Guardian Casualty Company, all corporations of New York.

The facts, as alleged in the bill of complaint and amendment and admitted by the motions to dismiss, are as follows: On December 13, 1930, the National Construction Company, a corporation of Florida, entered into a contract with the District of Columbia, a municipal corporation under Act of Congress, for the construction of the Theodore Roosevelt High School building and for certain remodeling of a wing of an adjoining building in the District, for $1,251,800.00. Bruckner-Mitchell, Inc., thereafter contracted with the National Construction Company to install a fireproof proscenium curtain and stage rigging in the High School building and to furnish all labor, equipment and materials therefor for $11,500.00 (Exhibit 1, R. 28). Bruckner-Mitchell, Inc., performed its contract and its work was

MARTIN, Chief Justice, and STEPHENS and ROBB, Associate Justices, dissenting in part.

approved by the District. Later, the entire building was approved and final payment made to the National Construction Company by the District. But to Bruckner-Mitchell, Inc., there nevertheless remains due from, and unpaid by, the National Construction Company since September 1, 1932, the sum of $2,000. It was to recover this sum that this suit was brought.

The buildings in question are public buildings within the meaning of the Act of February 28, 1899, 30 Stat. 906, as amended by the Act of September 1, 1916, 39 Stat. 688 (D.C.Code (1929) tit. 20, § 47). These statutes provide:

"That hereafter any person or persons entering into a formal contract with the District of Columbia for the construction of any public building * * * shall be required, before commencing such work, to execute the usual penal bond * * *." [30 Stat. 906]
and that—

"Hereafter, where formal written contracts with bonds are required to be made by the District of Columbia for work, material, or supplies, good and sufficient bonds to the District of Columbia shall be required from the contractors in a penal sum not less than twenty-five per centum of the amount of the contract, with sureties or a surety company to be approved by the Commissioners of the District of Columbia guaranteeing that the terms of the contract shall be strictly and faithfully performed to the satisfaction of said commissioners; that the contractors shall promptly make payments to all persons supplying them labor and materials in the prosecution of the work provided for in such contracts as now provided by law * * *." [39 Stat. 688–689]
and that—

"* * * any person or persons making application therefor and furnishing affidavit to the department under the direction of which said work is being or has been prosecuted that labor or materials for the prosecution of such work has been supplied by him or them, and payment for which has not been made, shall be furnished with a certified copy of said contract and bond, upon which said person or persons supplying such labor and materials shall have a right of action, and shall be authorized to bring suit in the name of the District of Columbia or the . United States for his or their use and benefit against said contractor and sureties and to prosecute the same to final judgment and execution: *Provided,* That such action and its prosecution shall not involve the District of Columbia or the United States in any expense * * *." [30 Stat. 906]

Pursuant to these requirements of law, the National Construction Company, as principal, and the New Jersey Fidelity & Plate Glass Insurance Company, a corporation of New Jersey, as surety, on or about February 10, 1931,[1] executed and delivered to the District a bond, under which they—

"* * * are held and firmly bound unto the District of Columbia in the sum of six hundred and twenty-five thousand, nine hundred dollars ($625,900) * * * to be paid to the said District of Columbia * * *." [Exhibit A, R. 10]

This bond contains the condition that if the National Construction Company—

"* * * shall strictly and faithfully perform, to the satisfaction and acceptance of the Commissioners of the District of Columbia, the work to be done by it in accordance with the stipulations of said contract * * * and will promptly make payments to all persons supplying it with labor and material in the prosecution of the work provided for in said contract * * * then this obligation to be void; otherwise to remain in full force and virtue." [Exhibit A, R. 9–11]

It was, however, the practice of the Commissioners, as alleged in the bill of complaint, to limit the amount for which they would accept a surety on such a bond to 10% of its paid up capital and surplus, unless it would furnish the District with an agreement or agreements under seal between itself and another surety or sureties providing that the latter would pay to the District any default of the surety on the original bond to the extent of a maximum liability limitation to equal the excess of the penalty of the original bond over 10% of the paid up capital and surplus of the surety on that bond. The penalty of the $625,900 bond executed by the New Jersey Fidelity & Plate Glass Insurance Company was much in excess of

---

[1] This bond is dated February 10, 1931. It was signed, sealed and witnessed February 25, 1931. But no point is made of this in the briefs.

10% of its paid up capital and surplus, and therefore in order to secure the approval of the Commissioners to its bond it executed on even date with the bond (February 10, 1931), and delivered to the District of Columbia a separate written contract under seal, captioned "Reinsurance Agreement in Favor of the District of Columbia," with the appellee, United States Casualty Company, whereby the latter, in consideration of $1500 paid by the New Jersey Company—

" * * * in the event of the insolvency of the said New Jersey Fidelity & Plate Glass Insurance Co. or of its failure to pay any default under said bond [bond of the National Construction Company in the sum of $625,900] equal to or in excess of Fifty thousand dollars ($50,000), the amount of this reinsurance, hereby covenants and agrees to pay to the District of Columbia, the obligee in said bond, the full sum of Fifty thousand dollars ($50,000), the amount of this reinsurance, and in case of the failure of the said New Jersey Fidelity & Plate Glass Insurance Company to pay to the District of Columbia any default for a sum less than Fifty thousand dollars ($50,-000), the amount of said reinsurance, then the said United States Casualty Company hereby covenants and agrees to pay to the District of Columbia the full amount of such default, or so much thereof as shall not be paid to the United States [2] by the said New Jersey Fidelity & Plate Glass Insurance Company it being the purpose and intent hereof to guarantee and indemnify the District of Columbia against loss under said bond of National Construction Company, Inc., as principal, to the extent of Fifty thousand dollars ($50,-000), or for any less sum than Fifty thousand dollars ($50,000) that may be owing and unpaid by the said New Jersey Fidelity & Plate Glass Insurance Company to the District of Columbia;

"And it is hereby further covenanted and agreed by the said United States Casualty Company that in case of default on said bond for Fifty thousand dollars ($50,000) or more, the said company may be sued by the District of Columbia for said amount of Fifty thousand dollars ($50,000), or for whatever the amount of the default may be less than Fifty thousand dollars ($50,000)." [Exhibit B, R. 12–13]

The New Jersey Company, further to secure the approval of the Commissioners to the bond in the sum of $625,900, upon which it was surety, executed, and delivered to the District of Columbia, a separate contract under seal with each of the appellees, Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America and Guardian Casualty Company, and with the Franklin Surety Company, a corporation of New York,[3] such contracts being Exhibits C (R. 14), D (R. 16), E (R. 18), F (R. 21), G (R. 23), and H (R. 25) respectively, and being in terms identical with those of Exhibit B except in respect of the amounts of the premiums and of the reinsurance. These amounts, including those mentioned above in Exhibit B, are as follows:

| Name | Consideration | Amount of reinsurance |
| --- | --- | --- |
| United States Casualty Company | $1,500.00 | $50,000.00 |
| Sun Indemnity Company of New York | 1,004.29 | 33,476.67 |
| General Reinsurance Corporation | 4,225.12 | 140,837.50 |
| Great American Indemnity Company | 1,877.70 | 62,500.00 |
| The Excess Insurance Company of America | 1,877.70 | 62,590.00 |
| Guardian Casualty Company | 1,173.56 | 39,118.75 |
| Franklin Surety Company | 1,500.00 | 50,000.00 |

After the execution of these reinsurance agreements, the bond of the National Construction Company as principal and the New Jersey Fidelity & Plate Glass Insurance Company as surety in the sum

2 The use of the words "United States" is apparently a mistake through use of a form bond. "District of Columbia" was without doubt intended. No point is made in the briefs of this mistake.

3 The defendant below, Lloyd's Casualty Company of New York, a corporation of New York, is named in the bill as the successor of the Franklin Surety Company and as having reinsured all of the unexpired and unmatured business of the Franklin Surety Company and as having accepted all outstanding liabilities of that company. For some reason not apparent herein, the Lloyd's Casualty Company of New York, though a defendant below, was not, so far as this record shows, a party to the motions to dismiss, and is not named as an appellee in the briefs or in the record.

of $625,900 was approved by the Commissioners of the District of Columbia. The aggregate amount of the maximum liability limitation of the reinsurers under their agreements, to wit, $438,522.92, equals the excess of the penalty of the original bond over 10% of the paid up capital and surplus of the surety thereon, that is, the New Jersey Fidelity & Plate Glass Insurance Company.[4]

The New Jersey Fidelity & Plate Glass Insurance Company became insolvent and unable to meet its obligations, its assets having, on May 28, 1932, been taken possession of by the Department of Banking and Insurance of the State of New Jersey for the purpose of liquidation. On November 21, 1932, Bruckner-Mitchell, Inc., requested the New Jersey Fidelity & Plate Glass Insurance Company to pay to it $4,000.00, the amount then due it under the contract with the National Construction Company, but the New Jersey Company has failed to pay that amount.[5]

Bruckner-Mitchell, Inc., has requested the reinsurers, United States Casualty Company, Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America, Guardian Casualty Company, and Lloyd's Casualty Company of New York (as successor to the Franklin Surety Company) to pay said amount, but they have failed so to do. Subsequently the National Construction Company paid to Bruckner-Mitchell, Inc., $2,000, leaving remaining a balance of $2,000 due to Bruckner-Mitchell, Inc.[6]

On or about the time of the execution of the reinsurance agreements referred to as Exhibits B, C, D, E, F, G and H above [hereinafter called the first reinsurance agreements], the New Jersey Fidelity & Plate Glass Insurance Company procured from the same corporations who were the reinsurers in the first reinsurance agreements,[7] additional reinsurance agreements

[4] There is no direct allegation to this effect, but in view of the assertion in the bill that it was the practice of the Commissioners to require the aggregate amount of the maximum liability limitation of the reinsurers to equal the excess of the penalty of the original bond over 10% of the paid up capital and surplus of the surety thereon, and in view of the further allegation that the reinsurance agreements were made in order to secure the approval of the Commissioners in compliance with the aforesaid practice, we give the appellant, under the motions to dismiss, the benefit of the inference that the maximum liability of the reinsurers did equal the excess of the penalty over the 10% in question.

[5] Such failure constituted a default on its bond to the District of Columbia.

[6] On August 23, 1932, the National Construction Company as principal and the Consolidated Indemnity and Insurance Company, a defendant below, as surety, executed and delivered to the District of Columbia a bond under seal in the penal sum of $175,000 conditioned as follows: "Now, therefore, the conditions of the foregoing obligation are such that if the said National Construction Company, the New Jersey Fidelity and Plate Glass Insurance Company and/or the aforesaid reinsurance companies [United States Casualty Company, Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America, Guardian Casualty Company and Franklin Surety Company] ,will promptly make payment to all persons supplying labor and materials in the prosecution of work provided for in said contract, then this obligation to be void; otherwise, to remain in full force and virtue, subject to the following:

"It is the intent and purpose of this bond to indemnify persons furnishing labor and materials in the prosecution of the work provided for in said contract against loss, to the extent of such claims, if it should be finally adjudicated, after suit brought in a court of competent jurisdiction, that said reinsurers are not liable therefor, and such persons shall have the right to sue hereon in the same manner as upon the aforesaid bond executed by the New Jersey Fidelity and Plate Glass Insurance Company. Persons furnishing labor and materials as aforesaid may join this bond in any suit filed against the aforesaid reinsurers, but no liability shall accrue hereunder if said reinsurers shall be held liable for claims for labor and materials as aforesaid * * *." [Exhibit J., R. 31–32] The responsiveness of this bond to persons supplying labor and material, if the reinsurance agreements above described are held not responsive, is not questioned in this appeal. But this bond is set out here in order that the prayers in the bill may be understood.

[7] That is, from the United States Casualty Company, Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America, Guardian Casualty Company, and Franklin Surety Company.

under seal executed on a form called "Standard Form of Reinsurance Agreement." [These agreements are hereinafter referred to as standard reinsurance agreements.] [8] The one with the Guardian Casualty Company as reinsurer, reinsured the New Jersey Fidelity & 'Plate Glass Insurance Company in the sum of $39,118.75 as the reinsurer's total liability (Exhibit K, R. 39). Each of these standard reinsurance agreements was in words and figures the same as that executed by the Guardian Casualty Company except for the difference in the name of the reinsurer and the difference in the limit of the reinsurer's total liability; and the maximum limitation of liability provided for in each of such standard reinsurance agreements, including that of the Guardian Casualty Company, was the same as the maximum limitation of liability of each of the reinsurers under the first reinsurance agreements executed by them, as above set forth, that is, the identical sums set forth in the tabulation above. The New Jersey Company paid each of the reinsurers as consideration for both the standard reinsurance agreement and first reinsurance agreement one premium, to wit, the amount stated in each of the first reinsurance agreements, that is, the identical sums set forth as premiums in the tabulation above. Such premium was, in each instance, that proportion of the total premium chargeable for the original bond executed by the New Jersey Company which the amount of the reinsurer's liability bore to the total liability of the New Jersey Company under the original bond. By each of the standard reinsurance agreements it was provided that an attached copy of the original bond of the New Jersey Company to the District of Columbia is a part of the standard reinsurance agreement. Each of the standard reinsurance agreements further provided that—

"13. If, under any law, this reinsurance agreement is required to be in such form as to enable the obligee or beneficiary of the bond to maintain an action hereon against the Reinsured jointly with the Reinsurer, and upon recovering judgment against the Reinsured to have recovery against the Reinsurer for payment to the extent in which it may be liable under this reinsurance and in discharge thereof, then this agreement shall be deemed to be a compliance with such law * * *." [Exhibit K, R. 46.] At the time of the execution and delivery of the standard reinsurance agreements, the Insurance Law of the State of New York [9] provide in part that—

"§ 24. LIMITATION OF RISK. No stock corporation transacting fidelity or surety business in this state shall expose itself to any loss on any one fidelity or surety risk or hazard in an amount exceeding ten per centum of its capital and surplus, unless it shall be protected in excess of that amount by:

"(a) Reinsurance in a corporation authorized to transact the fidelity or surety business in this state, provided that such reinsurance is in such form as to enable the obligee or beneficiary to maintain an action thereon against the company reinsured jointly with such reinsurer and, upon recovering judgment against such reinsured, to have recovery against such reinsurer for payment to the extent in which it may be liable under such reinsurance and in discharge thereof."

At the time of executing and delivering its original bond to the District of Columbia, the New Jersey Fidelity & Plate Glass Insurance Company was a stock corporation and in addition to transacting business in the District of Columbia was engaged generally in transacting fidelity or surety business in the State of New York. Each of said standard reinsurance agreements also provided—

" * * * but the Reinsurer shall in no event be liable hereunder for a greater proportion of any loss, costs, expenses, and interest than the proportion that the amount of reinsurance bears to the amount of the bond." [Exhibit K, R. 39–40.]

The total amount of the standard reinsurance is $438,522.92 [10] and the amount of the original bond is, as above stated, $625,900.

[8] The actual date of the standard reinsurance agreements is January 27, 1931, and that of the bond and the first reinsurance agreements, as above pointed out, February 10, 1931. But no point is made of this in the briefs.

[9] Insurance Law, § 24, McKinney's Consolidated Laws of New York, c. 28.

[10] The same sum as the total amount of the first reinsurance agreements.

Upon all set out above as the foundation of its suit, the appellant, Bruckner-Mitchell, Inc., further asserted, as plaintiff below, that the first reinsurance agreements are contracts under seal for its benefit as well as for that of the District of Columbia, but that if it is not entitled to the protection of the first reinsurance agreements, it is nevertheless entitled to that of the standard reinsurance agreements and therefore to recover from the reinsurers therein named and from Lloyd's Casualty Company of New York (which, as aforesaid, has assumed the liabilities of the Franklin Surety Company) the proportionate part of its (Bruckner-Mitchell, Inc.'s) claim for which the standard reinsurers are liable, and to recover the balance of its claim from the defendant below, Consolidated Indemnity and Insurance Company.[11]

The appellant further alleged that there is a community of interest among all of the defendants, other than the District of Columbia, in the questions of law and fact involved in the proceeding, and that in order to avoid a multiplicity of suits, the trial court has jurisdiction to hear and determine such questions and to adjudicate in one proceeding the liability of the defendants below to the appellant as plaintiff below, and the appellant further asserted that the matters involved in the proceeding can be more conveniently disposed of in one proceeding than they could be in separate proceedings. The bill of complaint made the District of Columbia a defendant in its own right, but sought no relief against it.

Upon the basis of all of the foregoing, the appellant as plaintiff below prayed that: (1) A decree be entered requiring the United States Casualty Company, the Sun Indemnity Company of New York, the General Reinsurance Corporation, the Great American Indemnity Company, The Excess Insurance Company of America, the Guardian Casualty Company and the Lloyd's Casualty Company of New York (as successor to the liabilities of the Franklin Surety Company) to pay the plaintiff $2,000 together with interest from September 1, 1932, until paid [i. e., to respond upon the first reinsurance agreements]; (2) In the event it is determined that these defendants are not liable to the plaintiff upon the first reinsurance agreements, a decree be entered directing the defendant, Consolidated Indemnity and Insurance Company, to pay plaintiff the said sum and interest; (3) In the event the court determines the foregoing defendants [other than the Consolidated Indemnity and Insurance Company] to be liable to the plaintiff by virtue of the standard reinsurance agreements only, the court then determine the amount of liability of each of these defendants to the plaintiff and that a decree be entered directing each to pay plaintiff the amount so determined to be its liability, and also directing the defendant Consolidated Indemnity and Insurance Company to pay the plaintiff the balance.

There were two motions to dismiss the bill of complaint and amendment, one by the United States Casualty Company and one by the Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America, and the Guardian Casualty Company. As stated above in footnote 3, the Lloyd's Casualty Company of New York, though a defendant below, was not, so far as the Record shows, a party to either of the motions to dismiss. The motion by the United States Casualty Company was upon the grounds that: (1) No cause of action is stated against the United States Casualty Company because both the first reinsurance agreement, between it and the New Jersey Fidelity & Plate Glass Insurance Company (Exhibit B) and the standard reinsurance agreement, between it and the same company (in the form of Exhibit K), both under seal, show on their face that the plaintiff below, Bruckner-Mitchell, Inc., was not a party to these instruments under seal and that they were not executed for the plaintiff's benefit and that the plaintiff was not privy to them, nor to the consideration therefor; (2) The contract between the National Construction Company and the District of Columbia was executed in the District of Columbia for public work in the District and is governed by the Federal statutes relating to the District of Columbia; the bond executed by the National Construction Company as principal and the New Jersey

---

[11] Under its bond (set out in footnote 6 above) made responsive to persons supplying labor and material if to such persons the first reinsurance agreements were held not responsive.

Fidelity & Plate Glass Insurance Company as surety (Exhibit A) was executed under the Federal statutes applicable thereto [those set out above] and is governed thereby and by the proper regulations of the District of Columbia applicable thereto; and there is no allegation in the bill or the amendment thereto that any law of the District of Columbia or any regulation thereof requires a reinsurance agreement in the form designated Exhibit K [i. e., the standard reinsurance agreement]. The motion to dismiss by the other defendants was upon the grounds that: (1) The plaintiff below has an adequate remedy at law; (2) The bill does not contain sufficient facts to entitle the plaintiff below to equitable relief; (3) As a matter of law, the agreements of reinsurance executed by the defendants below are not liable for the payment of labor and material claims; (4) The agreements of reinsurance were not given in pursuance of the Act of Congress upon which the suit is based; (5) The reinsurance agreements are agreements of indemnity for the District of Columbia solely; (6) The bill contains a misjoinder of parties and causes of action. The errors assigned on this appeal are that the court erred in sustaining the motions to dismiss the bill of complaint and amendment thereto and in dismissing the bill of complaint and amendment.

More briefly stated, the motions to dismiss and the assignments of error present five main questions: I. Are the reinsurers liable upon the first reinsurance agreements to a person supplying materials or labor (hereinafter referred to as a materialman)? II. Are the reinsurers liable to such a person upon the standard reinsurance agreements? III. Is the suit properly brought in equity? IV. Is there a misjoinder of parties and causes of action? V. Is the suit properly brought by the appellant, plaintiff below, in its own name?

I. Are the reinsurers liable to materialmen upon the first reinsurance agreements? The position of the appellees in support of the ruling of the trial court in the negative is, shortly, as follows: Such rights as exist under the first reinsurance agreements flow from their terms, and these show without ambiguity that the agreements were executed to protect the District of Columbia alone and in its own right against loss by reason of the insolvency of the New Jersey Company, or of the failure of the New Jersey Company to pay to the District any loss the latter may have sustained under the original bond, that is, any loss by reason of failure in faithful performance of the construction contract. While the first reinsurance agreements are captioned in favor of the District of Columbia, it is not a party, nor are materialmen parties, to these agreements. The only parties are the New Jersey Company and the reinsurers. The District of Columbia itself, a stranger both to the consideration and the instruments, is in the position merely of a third party beneficiary, and could not itself, under the common law rule concerning sealed instruments, sue the reinsurers thereon, except for the special provision of the agreements permitting it to do so. Much less may a materialman, not even mentioned, sue. The purpose of the Federal statutes requiring the original bond is two-fold, first, to secure to the District of Columbia the faithful performance of the contract, and second, to protect materialmen supplying the contractor. Therefore, the two objectives which the statutory bond contains, the one for the benefit of the District and the other for the benefit of materialmen, are as distinct as if they were contained in separate instruments, the name of the District of Columbia being used as obligee in the second merely as a matter of convenience. In view of this dual character of the statutory bond, the mere reference to it in the preamble of the first reinsurance agreements is no indication of an intention that the reinsurers shall be obligated to materialmen. It is also asserted that the statutes in question give no authority to the Commissioners of the District of Columbia to require the execution of reinsurance agreements, and hence no rights to materialmen can arise thereunder. In support of these contentions, the following cases are relied on: United States, to Use of H. F. Hutchens v. Batson-Cook Company et al., 13 F.Supp. 628, decided in the United States District Court for the Eastern District of Virginia July 6, 1933, by Way, J.; United States, to Use of Anniston Pipe & Foundry Co. v. National Surety Co. (C.C.A.) 92 F. 549; Equitable Surety Company v. United States of America, to Use of McMillan, 234 U.S. 448, 34 S.Ct. 803, 58 L.Ed. 1394; Maiatico Construction Company, Inc., v. United States of America,

to Use of R. Bland Phelps, Trading as R. B. Phelps Stone Co. et al., 65 App.D.C. 62, 79 F.(2d) 418, decided by this court, certiorari denied, 56 S.Ct. 309, 80 L.Ed. ——, December 9, 1935. United States v. Batson-Cook Company involved a reinsurance agreement similar in terms to the first reinsurance agreements in the instant case, and the court held that no rights arose thereunder in favor of materialmen. United States v. National Surety Co. held that a surety on a statutory bond executed under the so-called Heard Act in its original form, Act of August 13, 1894, 28 Stat. 278 [later amended, Act of February 24, 1905, 33 Stat. 811, and Act of March 3, 1911, § 291, 36 Stat. 1167, 40 U.S.C.A. § 270], which parallels in reference to contracts of construction for the United States the Federal statutes applicable to such contracts with the District of Columbia, is not released from liability to materialmen because of changes in the contract between the United States and the contractor without the surety's knowledge or consent, where the general nature of the work and materials remains the same; this for the reason that when the United States has executed the contract and taken the bond, it ceases to be the agent of third parties from whom the contractor obtains materials; and the functions and obligations of the bond being dual and distinct, the obligation of the surety to the materialmen is unaffected by subsequent transactions affecting the obligation between the United States and the contractor. Equitable Surety Company v. U. S., to Use of McMillan involved the same question of law as that in United States v. National Surety Co., referred to the decision in that case with approval, and reached the same conclusion. Maiatico Construction Company, Inc., v. United States, also decided under the Heard Act, denied right of recovery to materialmen upon a bond taken to secure the performance of a contract of construction of buildings on land owned by Howard University, for the reason that, as the court held, the buildings were not public buildings or public works within the meaning of the statute, and hence the bond taken by the United States was one taken without authority and therefore no rights accrued thereunder to materialmen. Appellees particularly rely upon the statement of the court in that case that—

"If the bond was not one of the nature contemplated by the statute, no rights ac-crued to appellees for the reason that in such case the act would not authorize its execution." [65 App.D.C. 62, 79 F.(2d) 418, 424.]

These contentions of appellees supporting the trial court's dismissal of the case are really three, that: (1) Materialmen are not named parties in the first reinsurance agreements and hence cannot sue thereon; (2) They are not third party beneficiaries because the terms of the instruments do not include them as such; (3) No rights can arise under the agreements because the statutes do not authorize their execution.

We are of the view that these contentions of the appellees in support of the ruling of the trial court are not well founded and that the reinsurers are liable to materialmen upon the first reinsurance agreements:

■ (1) With respect to the first of the appellees' points, it is true that materialmen are not named parties in the reinsurance agreements and hence cannot at common law sue thereon as parties; but the appellant in the instant case does not sue upon the first reinsurance agreements in the strict common law sense. It sues as a third party beneficiary of the agreements, as one having rights in equity.

■ (2) As to the second of appellees' points, that the terms of the first reinsurance agreements do not include materialmen as third party beneficiaries: There are more than mere preamble references in these agreements to the original bond. In the obligatory portion the reinsurer— " * * * in the event of the insolvency of the said New Jersey Fidelity & Plate Glass Insurance Co. or of its failure to pay *any default under said bond* * * * hereby covenants and agrees to pay to the District of Columbia, *the obligee in said bond* * * *." [Italics supplied.] It is apparent from the preamble references, and it is without dispute, that the bond therein and elsewhere in the agreements referred to is the original construction bond. While these references do not incorporate the bond in the agreements, they do make it necessary to refer to that instrument in order to determine what is a default thereunder, and they do make known that the District of Columbia, to which payment is to be made, is the obligee in the original bond. Reference to the bond makes clear that it secures to the District of Columbia,

the obligee, not only that the National Construction Company—

" * * * shall strictly and faithfully perform, to the satisfaction and acceptance of the Commissioners of the District of Columbia, the work to be done by it in accordance with the stipulations of said contract * * *"

but also that the National Construction Company—

" * * * will promptly make payment to all persons supplying it with labor and material in the prosecution of the work provided for in said contract * * *" [Exhibit A, R. 10–11]

and thus makes clear that non-payment of a materialman is a default under the bond. The phrase *any default under said bond* in the first reinsurance agreements is plain and all inclusive language. It is our view that not without doing violence to it can it be said not to include non-payment of materialmen as well as failure strictly and faithfully to perform the work to be done in accordance with the contract. The fact that payment, under the reinsurance agreements, is to be made to the District of Columbia is not conclusive that only such a default under the bond as would affect the District in its own right, as distinguished from such a default as affects materialmen, is intended to be covered by the reinsurance agreements. While the cases of United States v. National Surety Co. and Equitable Surety Company v. U. S., to Use of McMillan, above, relied upon by appellees, do hold as above set forth that the obligations of the bond are dual and distinct, and while the first mentioned of these cases does state that—

"When the government has executed the contract and taken and approved the bond, it ceases to be the agent of third parties whom the contractor employs * * * or from whom he obtains materials * * *" [92 F. 549, 552]

this language, used by the Circuit Court of Appeals, we think had reference only to the question whether, after the execution of the bond, alterations in the contract agreed to by the governmental body [in that case the United States] and the contractor would release the surety on the bond so far as its obligation to materialmen was concerned, and that all that the court meant by its reference to the cessation of agency between the governmental body and the third parties was that there was no such agen-

cy as would bind the latter so far as release of the surety was concerned. Moreover, in Equitable Surety Company v. U. S., to Use of McMillan, the second of the cases just mentioned, decided subsequent to the first and by the United States Supreme Court, that Court, further describing the position of those affected by the bond, treats the governmental body, in that case the District of Columbia, the obligee in the statutory bond, in its relationship to materialmen, as a nominal obligee and a trustee. The United States Supreme Court said—

"The nominal obligee is, with respect to these third parties, a mere trustee, and the obligors, including the surety as well as the principal contractor, enter into the obligation in full view of this." [234 U.S. 448, 456, 34 S. Ct. 803, 805, 58 L.Ed. 1394.]

In our view these two cases, read together, do not compel the conclusion that, because the two obligations under the bond are distinct, any mention in the first reinsurance agreements of the District of Columbia as obligee in the bond necessarily refers to the District of Columbia in its own right alone. Indeed since we conclude, as above stated, that the phrase *any default under said bond* includes non-payment of materialmen, these cases would require the District of Columbia to hold payments made to it, because of a default in the bond affecting materialmen, as nominal obligee and trustee for them.

The clause in the first reinsurance agreements especially relied upon by the appellees and emphasized in the decision above mentioned of the United States District Court for the Eastern District of Virginia—

" * * * it being the purpose and intent hereof to guarantee and indemnify the District of Columbia against loss under said bond * * *"

does not in our view restrict the liability of the reinsurers to payment on account of such a default only as affects the District of Columbia in its own right. It is true that in this clause the words *any default under said bond* are not repeated, but the clause cannot be read without reference to the whole of the agreements, including the words *any default under said bond,* and cannot be read without reference to the bond.

444

 But if it be incorrect to say that the language of the first reinsurance agreements plainly includes a default in the obligation of the bond to materialmen, then the best that can be said for the disputed language is that the application of the phrase *any default under said bond* is thrown *into doubt* because of the covenant in the reinsurance agreements—

"* * * to pay to the District of Columbia, obligee in said bond * * *" without express reference to materialmen, and because of the language of the purpose and intent clause just above quoted. Certainly it cannot be said that the language of the agreements plainly *excludes* a default in the obligation to materialmen. If, therefore, we proceed from the premise that the language of the first reinsurance agreements is ambiguous, it is then proper to have reference to the circumstances surrounding the execution of the agreements in order to resolve the ambiguity; and these circumstances point quite definitely to the conclusion that the phrase *any default under said bond* was intended to cover a default to materialmen as well as to the District of Columbia in its own right. The first reinsurance agreements were executed in order to secure the approval of the Commissioners to the bond. They were of even date with the bond. It was the duty of the Commissioners under the statute to take a good and sufficient bond with sureties approved by the Commissioners guaranteeing that the contract shall be strictly and faithfully performed and that the contractor shall promptly make payments to materialmen. In the absence of a contrary showing, and there is none

herein, the Commissioners will be presumed to have performed their duty, not to have violated it by exacting reinsurance to strengthen the surety and the bond only for the benefit of the first of the obligations thereof, i. e., only for the District of Columbia in its own right, and this in the face of recognition by the statutes and the courts of the existence of two obligations under such a bond, and in the face of the fact that under the applicable statutes calling for bonds on District of Columbia construction contracts, no priority over the proceeds of the bond is given the District of Columbia as against materialmen.[12]

 It is true that typical reinsurance agreements do not operate in favor of the original insured. They are merely contracts of indemnity of the insurer and there is no privity between the original insured and the reinsurer. But nothing in the law forbids drafting reinsurance agreements in special terms so that they will operate in favor of the original insured. Globe National Fire Insurance Company v. American Bonding & Casualty Company, 198 Iowa, 1072, 195 N.W. 728, 200 N.W. 737, 35 A.L.R. 1341. See also the extensive note commencing on page 1348 of 35 A.L.R., especially at topic *b* on page 1351. We think the first reinsurance agreements in the instant case were not typical agreements but were special, and we conclude that according to the terms thereof the reinsurers are liable to materialmen. In United States v. Union Indemnity Company (D.C.) 6 F.Supp. 360, where a construction contract performance bond was furnished under the Heard Act by the Union In-

[12] The Heard Act in its original form, Act of August 13, 1894, 28 Stat. 278, accorded no priority to the United States, and the courts under the Heard Act in its original form denied priority. See United States v. Heaton (C.C.A.) 128 F. 414 and United States v. American Surety Company of New York (C.C.A.) 135 F. 78. By amendment, Act of February 24, 1905, 33 Stat. 811, priority was accorded the United States. And see American Surety Company of New York v. Westinghouse Electric Manufacturing Company, 296 U.S. 133, 56 S.Ct. 9, 10, 80 L.Ed. —, decided by the United States Supreme Court November 11, 1935, where the Court in reference to a bond given under the Heard Act said—

"Laborers and materialmen, together with the Government, are obligees or bene-

ficiaries of a bond so given (Equitable Surety Co. v. United States, 234 U.S. 448, 34 S.Ct. 803, 58 L.Ed. 1394; Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Brogan v. National Surety Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703, L.R.A. 1918D, 776); though the claims, if any, of the government are to have priority of payment. 40 U.S.C.A. § 270."

By Act of July 7, 1932, 47 Stat. 608 (D.C.Supp. I, 1933, T. 20, § 47), the statutes requiring bonds on District of Columbia construction contracts were amended so as to accord priority to the claim of the District of Columbia. This amendment, however, is inapplicable in the instant case, the bond and all of the other instruments in the instant case having been executed prior thereto.

demnity Company as surety and the surety—

"* * * entered into a reinsurance agreement with the * * * International Reinsurance Corporation * * * in favor of the United States, reinsuring and counter-securing the said Union Indemnity Company on said contract and bond * * *" [6 F.Supp. 360, 361] it was held that the reinsurance agreement was responsive to materialmen. The District Court in that case treated the reinsurance agreement as an additional bond, taken under the statute, to which recourse could be had by either the United States or materialmen. We do not agree that the reinsurance agreement was an additional statutory bond for the reason that it was not executed by the contractor. But we think the case right in its result.

We are obliged to disagree with the decision in United States v. Batson-Cook Company in the District Court of the United States for the Eastern District of Virginia, relied upon by appellees. It is to be commented, however, that while the reinsurance agreement therein was apparently similar in terms to those now under discussion in the instant case, it is not made to appear in that case that the reinsurance agreement was executed, as were the first reinsurance agreements in the instant case, as a prerequisite to the approval of the construction bond and of the surety thereon.[13]

The case of Sun Indemnity Company of New York v. American University, 58 App.D.C. 184, 26 F.(2d) 556, decided by this court, is not contrary in its implications to the conclusions we reach. In that case a materialman was denied right of recovery on a construction con-

tract bond, executed and delivered to American University and—

"* * * conditioned that the Construction Company should faithfully perform all the work and furnish all the labor and materials required by the contract, and should promptly make payment to all persons supplying labor and materials in the prosecution of the work contemplated by the contract." [58 App.D.C. 184, 26 F.(2d) 556.] This court held that the manifest purpose of that bond and of all of its provisions was to protect the named obligee, American University, and that the provisions with respect to payment of debts incurred for labor and materials were designed to save the University from mechanics' liens upon the property. This basis for the decision does not exist here. Moreover that bond was not taken out in pursuance of a statute which as in the instant case expressly requires the bond to be conditioned for the protection of materialmen and gives them a right of action thereon.

■ (3) Respecting the third of appellees' points, that no rights can arise under the first reinsurance agreements because the statutes do not authorize their execution: Appellees rely upon the case of Maiatico Construction Company, Inc., v. United States, cited above. That case is not to the contrary of the views we express. There the Secretary of the Interior, who exacted a bond to secure for the United States the performance of a contract of construction of buildings for Howard University, had no authority whatever to exact the bond because the buildings in question were not public buildings. The Heard Act, like the statutes applicable in the instant case, relates only

[13] Subsequent to the argument the court was furnished by the attorneys for the appellees Sun Indemnity Company of New York, General Reinsurance Corporation, Great American Indemnity Company, The Excess Insurance Company of America and Guardian Casualty Company, a typewritten purported copy of an unreported decision of the United States District Court for the Western District of Kentucky in the case of United States of America for the use and benefit of Thomas Brown et al. v. William B. Pell & Bro., Inc., et al., No. 1610, rendered in January, 1935. The decision is apparently to the effect that certain bonds, each styled "Reinsurance Agreement in Favor of the United States," were not responsive to laborers and materialmen for labor and ma-

terials furnished under a contract for the construction of a public building. The decision was apparently rendered upon demurrers and motions attacking the petitions of laborers and materialmen, but the purported copy does not set out the allegations of the petitions and it, therefore, does not appear under what state of facts the bonds were executed or whether they were in terms identical with those of the first reinsurance agreements in the instant case. Assuming, however, that the facts in the case referred to and the terms of the bonds were the same as the facts and as the terms of the first reinsurance agreements in the instant case, we are obliged to disagree with this decision also.

to public buildings. The buildings in the instant case are public buildings and hence the Commissioners of the District of Columbia did have authority under the statutes, indeed a duty, to exact a sufficient bond with a surety to be approved by the Commissioners. The requiring of the first reinsurance agreements so that the Commissioners could approve the bond and the surety thereon, was properly incidental to the performance of their duty and within their authority.

II. Are the reinsurers liable to materialmen upon the standard reinsurance agreements? A majority of the court, Chief Justice MARTIN, Mr. Justice VAN ORSDEL and Mr. Justice GRONER, are of the view that no cause of action is stated upon the standard reinsurance agreements.

From this position I dissent, and I am authorized to state that Mr. Justice ROBB agrees with me: Upon this topic the contention of the appellees in support of the trial court's dismissal of the case, is that: The standard reinsurance agreements are typical reinsurance agreements upon which under settled law, unless paragraph 13 thereof is operative, no rights can arise in materialmen, and paragraph 13 is not operative, for the reason that the contracts are to be interpreted, unless the parties otherwise agree, according to the law where they are executed and to be performed, and this was the District of Columbia, and no law in the District authorizes recovery upon a typical reinsurance contract by materialmen, and the parties have not in the contract made it subject to interpretation by the law of New York. Appellees cite United States v. Federal Surety Co. (C.C.A.) 72 F.(2d) 964, affirming the same case in (D.C.) 5 F.Supp. 247. Mr. Justice ROBB and I are of the view that the appellees' contention is not well taken, and that the case relied upon is not on all fours with the case at bar. It is not disputed by the appellant that the standard reinsurance agreements, being typical reinsurance agreements, would not, in the absence of the operation of paragraph 13 thereof, support a cause of action for materialmen; it is also not disputed that a contract is to be interpreted according to the law of the place where it is executed and to be performed. But this is not a case involving interpretation of a contract. The question is not what

does a provision of the standard reinsurance agreements mean, but whether it is legally contained in the agreements; that is to say, is paragraph 13 an operative provision. The standard reinsurance agreements are upon standard forms drawn for general use and contain provisions which are to be operative in some types of bonds and not in others, and under some circumstances and not under others, and pursuant to legal requirements which may exist in some states and not in others. Paragraph 13 provides as above pointed out that—

"13. If, *under any law*, this reinsurance agreement is required to be in such form as to enable the obligee or beneficiary of the bond to maintain an action hereon against the Reinsured jointly with the Reinsurer, and upon recovering judgment against the Reinsured to have recovery against the Reinsurer for payment to the extent in which it may be liable under this reinsurance and in discharge thereof, then this agreement shall be deemed to be a compliance with such law * * *." [Italics supplied.]

The question is whether paragraph 13 is to be operative because of some law so requiring. If the phrase *any law* were ambiguous it would necessitate interpretation, and that interpretation would, under the general rule stated, be according to the law of the District of Columbia. But the phrase *any law* is quite without ambiguity and is wholly inclusive. The New York law, relied upon by the appellant, is a law; and it does require paragraph 13 to be operative in the agreements under the particular circumstances of this case. It provides in relation to insurance companies—

"§ 24. LIMITATION OF RISK. No stock corporation transacting *fidelity or surety business* in this state shall expose itself to any loss on *any one fidelity or surety risk or hazard* in an amount exceeding ten per centum of its capital and surplus, unless it shall be protected in excess of that amount by: ·

"(a) Reinsurance in a corporation authorized to transact the fidelity or surety business in this state, provided that such reinsurance is in such form as to enable the obligee or beneficiary to maintain an action thereon against the company reinsured jointly with such reinsurer and, upon recovering judgment against such reinsured, to have recovery against

such reinsurer for payment to the extent in which it may be liable under such reinsurance and in discharge thereof." [Insurance Law, § 24, McKinney's Consolidated Laws of New York, c. 28.] [Italics supplied]

The New Jersey Fidelity & Plate Glass Insurance Company was a stock corporation transacting fidelity or surety business in the State of New York. It had exposed itself to a risk as surety on the original construction bond in an amount exceeding 10% of its [paid up] capital and surplus. The phrase *any one fidelity or surety risk or hazard* in the New York law is again an unambiguous and all inclusive term, and literally embraces, therefore, the risk to which the New Jersey Company exposed itself as surety on the bond. If the phrase *any one fidelity or surety risk or hazard* were thought to be ambiguous, it would not be subject to interpretation according to the law of the place of execution and performance of the reinsurance agreement required because it is not a part of the reinsurance agreement but a part of the New York law, and we would therefore look to New York law to see what the New York law meant. The history of that law shows clearly that the phrase *any one fidelity or surety risk or hazard* is not confined to risks undertaken within the State of New York but embraces risks wherever undertaken. The law above quoted, read, prior to 1919, as follows:

"§ 24. LIMITATION OF RISK. No domestic insurance corporation, nor any insurance corporation organized under the laws of any country outside of the United States, doing business in this state, shall expose itself to any loss on any one risk or hazard to an amount exceeding ten per centum of its capital and surplus. No insurance corporation incorporated under the laws of any other state of the United States, doing business in this state, shall expose itself to any loss on any one risk or hazard *within this state* to an amount exceeding ten per centum of its capital and surplus. No portion of any such risk or hazard which shall have been reinsured in a corporation authorized to do insurance business in this state shall be included in determining the limitation of risk prescribed in this section." [N.Y.Insurance Law 1909,

ch. 33, Act of Feb. 17, 1909 (chapter 28 of the Consolidated Laws), article 1, § 24] [Italics supplied]

Amendments of 1919 and 1920 altered the law to its present form, and the amendment of 1919, followed in this respect by the amendment of 1920, omitted the phrase *within this state,* and this in the face of the fact that in the 1909 form of the law the legislature had differentiated in succeeding sentences in the same paragraph between risks undertaken anywhere and risks undertaken within the State of New York. It is to be noted, moreover, that the application of the language *any one fidelity or surety risk or hazard* to risks undertaken out of as well as in the State of New York is consistent with the purpose of the statute, which is obviously to protect citizens of New York from doing business with fidelity or surety companies which are unsound. Risks incurred in places other than New York would affect their soundness as much as risks undertaken in the State of New York.

United States v. Federal Surety Co. (C.C.A.) 72 F.(2d) 964, was a suit to the use of materialmen against reinsurers on a reinsurance agreement reinsuring a surety company upon a Heard Act bond, and the agreement in that case was on a standard form, containing therefore the provisions of paragraph 13 of the standard reinsurance agreements herein. The general rule that because of lack of privity an action at law may not be brought by the original insured against a reinsurer under a strict contract of reinsurance was not disputed. But it was urged for the materialmen that under the Heard Act privity of contract between materialmen and surety is immaterial; and it was contended that when the reinsurers entered into the contract of reinsurance in respect of the contractor's bond, they became participants with the surety in a joint enterprise, since (according to the standard form) they received proportionate amounts of the premium, and became entitled to share in any collateral security, or in any salvage or recovery, and assumed proportionate shares of the liability;[14] and it was asserted that when paragraph 13 of the standard form is read in connection with the provisions of the Heard Act requiring the giving of

---

[14] Paragraphs 1 and 10 of the Standard Form of Reinsurance Agreement, Exhibit K, R. 39, 45, so provide.

a bond for the protection of material-men it is seen that the contract is one for the benefit of third persons and contemplates direct action by either the obligee or beneficiary of the bond. The Circuit Court of Appeals rejected this contention, saying—

"That [Heard] act does not fall within the description in the reinsurance agreement of a law which requires the agreement to be in such form as to enable the obligee or beneficiary of the bond to maintain a joint action against the surety company and the reinsurer." [72 F.(2d) 964, 968]

In the same case the lower court had said in reference to paragraph 13 of the standard form—

"I do not consider these provisions of the general conditions applicable to the instant case. So far as I am aware, there is no federal law, by either statute or decision, that makes these provisions of the bond applicable in this case. They were probably inserted because the general form of bond was prepared for use in any one of the United States and to meet the local conditions in some state or states resulting from special statutes or court decisions contrary in effect to the general law of reinsurance * * *." [5 F.Supp. 247, 250]

Mr. Justice ROBB and I do not disagree with the conclusion of the District Court and the Circuit Court of Appeals that the Heard Act [and therefore the parallel statutes applicable to District of Columbia construction contracts] does not fall within the description in the standard form of a law which requires the agreement to be in such form as to enable the obligee or beneficiary to sue the reinsurer jointly with the reinsured thereon, and we do not say with respect either to the first reinsurance agreements or the standard reinsurance agreements that the statutes applicable to District of Columbia construction contracts themselves require reinsurance. But the case under discussion does not hold that the New York law involved in this case does not fall within the description, in paragraph 13 of the standard reinsurance agreements, of a law which requires them to be in such form as to enable the obligee or beneficiary of the bond to sue the reinsurer and reinsured jointly, because no New York law or any similar law of any state was involved under the facts in that case. The provisions of paragraph 13 of the standard form may well have been inserted therein to meet local statutes or court decisions of the type referred to in the case under discussion, but also to meet such a local law as in the instant case is involved, that is, such a local law as the New York law. Moreover, if the language of paragraph 13 is without ambiguity, we cannot look to the purpose of its insertion, and, as we have above indicated, it seems to us not only unambiguous but all inclusive. Mr. Justice ROBB and I think that under the facts and statutes in the instant case involved it would be disregardful of the plain language of paragraph 13 of the standard form—

"If, under *any law*, this reinsurance agreement is required to be in such form, etc. * * *" [Italics supplied]

to hold that the New York law was not a law which made operative paragraph 13 as a compliance therewith.[15]

---

15 Certainly the phrase *any law* in paragraph 13—of a standard form of contract obviously drawn for *general use*—must be said to include at least all *relevant* laws of the country where the reinsurer is doing business. It is not a necessary proposition that laws relevant to reinsurance agreements are those laws only which are relevant under the principles of the choice of laws under the conflict of laws. Other laws may be relevant because they relate to reinsurance. Under such a view the New York law is a relevant law. If it be urged that under our (dissenting) view with reference to the standard reinsurance agreements, a law anywhere in the world might be relied on to bring paragraph 13 into operation, and that this would be to hold a party to the literality of his contract in a manner which "would blow the bubble of language and logic to the bursting point," it is to be answered that if the reinsurer were doing business in England, for example, and there were a law of England like the law of New York, it would be not a mere strict application of language and logic to hold that law applicable; it would be also reasonable to think that the reinsurer, in good faith, contracted with that law in mind. If a reinsurer in drawing paragraph 13 had in mind binding itself in respect only of the laws of the place of execution and performance of the contract as a whole, it could and should have used narrower words than *any law*. It is not for courts to relieve parties from a broad bargain any more than from a hard one if the language spelling the bargain is clear. Where language is clear, departure from

If, because paragraph 13 is at least printed in the standard forms, there be disagreement with the above reasoning because of its premise, to wit, that the question is not what does paragraph 13 mean but whether it is an operative provision in the standard reinsurance agreements, and its further premise that the phrase *any law* is not ambiguous, and if it hence be said that, before it can be determined whether the New York law is included within the phrase *any law* so as to make paragraph 13 operative, the meaning of the term *any law* must be interpreted and this according to the law of the District of Columbia, still the result is the same. The absence of any requirement local to the District of Columbia that reinsurance agreements shall be responsive to the beneficiaries of the original bond is not a law interpreting the meaning of the phrase *any law,* and we know of no District of Columbia law, and none has been cited, to the effect that that phrase is anything else than an all inclusive term. Moreover, if the phrase *any law* be said to be ambiguous, then it is proper, in order to determine its meaning, to have reference to the circumstances surrounding the execution of the standard reinsurance agreements, including the conduct of the parties. Included within these circumstances are the facts that, although the execution of the standard reinsurance agreements was not, as in the case of the first reinsurance agreements, prerequisite to approval of the original bond and the surety thereon, and although no law local to the District of Columbia required the surety on a construction bond to reinsure, nevertheless the standard reinsurance agreements were executed, and when they were executed the New Jersey Fidelity & Plate Glass Insurance Company, the reinsured and the surety on the original bond, had exposed itself to a risk in an amount exceeding 10% of its capital and surplus, and it was a stock corporation transacting fidelity business in the State of New York. These circumstances point to the conclusion that the very purpose of the execution of the standard rein-

surance agreements was compliance with the New York law and thus to the conclusion that the phrase *any law* in paragraph 13 was thought by the parties to mean such a law as the New York law.[16]

It follows that the standard reinsurance agreements must be read with paragraph 13 operating—
" * * * to enable the obligee or beneficiary of the bond to maintain an action against the Reinsured jointly with the Reinsurer and upon recovering judgment against the Reinsured to have recovery against the Reinsurer * * *."
The reinsured New Jersey Company is a defendant in this case and under the prayer for general relief a decree against it would be warranted. Mr. Justice ROBB and I think, therefore, that upon the standard reinsurance agreements as well as upon the first reinsurance agreements herein a cause of action was stated for the appellant, plaintiff below, as a materialman beneficiary of the original construction bond.

III. Is the suit properly brought in equity? It is the view of the court that the first reinsurance agreements herein are, in respect of a materialman, contracts for the benefit of a third party. They are, however, sealed instruments. A materialman is not a party thereto in the strict common law sense and he cannot therefore proceed thereon at law in the District of Columbia. Willard v. Wood, 135 U.S. 309, 10 S.Ct. 831, 34 L.Ed. 210. But he has enforceable equitable rights. Princess Amusement Co. v. Wells (C.C.A.) 271 F. 226, certiorari denied 256 U.S. 701, 42 S.Ct. 623, 65 L.Ed. 1178. In that case the Circuit Court of Appeals for the Sixth Circuit said—
"The rule is well settled that one for whose benefit a promise is made, though not himself the promisee, may sue in equity for the enforcement of the promise." [271 F. 226, 229.]
See also Williston on Contracts, vol. 1, § 368, at page 697.

Mr. Justice ROBB and I, who, as above set forth, are of the view that a cause of action is stated upon the standard re-

it by courts leads but to an uncharted sea of opinion as to what a party ought to be bound to do.

16 It may be that the standard reinsurance agreements were executed for the additional purpose of dividing a large risk in conformity with a business practice of the New Jersey Fidelity & Plate Glass Insurance Company so to do. But there is nothing in the Record concerning such a practice, and nothing in the Record to establish that such was the sole purpose of the agreements.

insurance agreements, think that they also operate, under paragraph 13, in respect of a materialman under the original bond, as contracts for the benefit of a third party, and that again, therefore, since the materialman beneficiary is not actually one of the original contracting parties, he cannot proceed at law in the District of Columbia, but that again he has enforceable equitable rights.

IV. Is there a misjoinder of parties and causes of action? Asserting that there is such a misjoinder, appellees apparently rely upon the general rule that persons liable on several distinct contracts or obligations, although with the same person or set of persons, cannot be joined as defendants in one action at common law, but must be sued separately. We have already pointed out that this suit is not at law but in equity. Equity Rule No. 19 of the Supreme Court of the District of Columbia provides—

"The plaintiff may join in one bill as many causes of action, cognizable in equity, as he may have against the defendant * * * and if there be more than one defendant the liability must be one asserted against all of the material defendants, *or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice.* If it appear that any such causes of action cannot be conveniently disposed of together, the court may order separate trials." [Italics supplied.] This is the same rule as Federal Equity Rule No. 26 (28 U.S.C.A. following section 723). There is a common point of litigation between the appellant, plaintiff below, on the one part and the reinsured and each of the reinsurers on the other, under the first reinsurance agreements, since the reinsured and each of the reinsurers are parties to identical instruments under each of which the plaintiff is a third party beneficiary. We are of the view that under these circumstances it would be extremely impractical and inconvenient for the court and the parties to deal with the plaintiff's claim in seven separate suits, that is, one suit on each of the first reinsurance agreements. The joinder of all of the parties and of all of the causes under the first reinsurance agreements and the determination of the rights of all of the parties thereunder in one case will, in our view, promote the convenient administration of justice for all of the parties and for the court. As was said by Mr. Justice McLean in Gaines v. Chew, 2 How. 619, at page 642, 11 L.Ed. 402—

"It is well remarked by Lord Cottenham, in Campbell v. Mackay, 7 Simon, 564, and in 1 Mylne and Craig 603, 'to lay down any rule, applicable universally, or to say, what constitutes multifariousness, as an abstract proposition, is, upon the authorities, utterly impossible.' Every case must be governed by its own circumstances; and as these are as diversified as the names of the parties, the court must exercise a sound discretion on the subject. Whilst parties should not be subjected to expense and inconvenience, in litigating matters in which they have no interest, multiplicity of suits should be avoided, by uniting in one bill all who have an interest in the principal matter in controversy, though the interests may have arisen under distinct contracts."

Because each case under the objection of multifariousness must be governed by its own circumstances, it is not useful to cite extensive authority. The following, however, support the general proposition above set forth: Brown v. Guarantee Trust & Safe Deposit Company, 128 U.S. 403, 410–412, 9 S.Ct. 127, 32 L.Ed. 468; Watson v. Bonfils (C.C.A.) 116 F. 157, 159; Schell v. Leander Clark College (C.C.A.) 2 F.(2d) 17, 19–21; Westinghouse Air Brake Co. v. Kansas City Southern Ry. Co. (C.C.A.) 137 F. 26, 31–33; Crawford v. Washington Northern R. Co. (C.C.A.) 233 F. 961, 966.

In the view of Mr. Justice ROBB and myself, who agree, as above set forth, that a cause of action was stated upon the standard reinsurance agreements, the joinder of the causes and parties involved therein with the causes and parties involved in respect of the first reinsurance agreements would make more clear the convenience of one suit. Otherwise, there would be either fourteen separate suits, that is, one suit against the reinsurer on each of the first reinsurance agreements and one suit against the reinsured and the reinsurer on each of the standard reinsurance agreements, or two separate suits, one against all of the reinsurers under the first reinsurance agreements and one against the reinsured and all of the reinsurers under the standard reinsurance agreements.

V. Was the suit properly brought by the appellant, plaintiff below, in its own name? Equity Rule No. 13 of the Supreme Court of the District of Columbia provides—

"Every action shall be prosecuted in the name of the real party in interest * * *." A materialman as third party beneficiary under the first reinsurance agreements is a real party in interest.[17]

We conclude that the action of the trial court in dismissing the bill of complaint and amendment thereto was erroneous and its decree is therefore reversed, and the case remanded for trial.

MARTIN, Chief Justice.

As indicated, Mr. Justice VAN ORSDEL, Mr. Justice GRONER and I hold that no cause of action is stated under the standard reinsurance agreements (point II). I dissent from the view expressed by the majority of the court in respect of the first reinsurance agreements (point I), being of the opinion myself that no cause of action is stated thereunder. I agree, however, that if a cause of action had been stated under either the first or the standard reinsurance agreements, the suit thereon would have properly been in equity (point III), and there would have been no misjoinder of causes and parties (point IV), and the suit would properly have been brought by the appellant, plaintiff below, in its own name (point V).

VAN ORSDEL, Associate Justice.

I agree, and I am authorized to state that Mr. Justice GRONER agrees with me, that if a cause of action had been stated under the standard reinsurance agreements (point II), as well as under the first reinsurance agreements (point I), the suit in respect of the standard reinsurance agreements would, like the suit in respect of the first reinsurance agreements, have properly been in equity (point III), and there would have been no misjoinder of causes and parties (point IV), and the suit would properly have been brought by the appellant, plaintiff below, in its own name (point V).

---

[17] Mr. Justice ROBB and I, who agree, as above set forth, that a cause of action is stated for materialmen upon the standard reinsurance agreements as well as upon the first reinsurance agreements, are of the further view that a materialman as third party beneficiary under the standard reinsurance agreements is a real party in interest, and that therefore with respect of those agreements also the suit was properly brought by the appellant, plaintiff below, in its own name.