**MOUNTAIN STATES MUTUAL CASUALTY COMPANY, a corporation, Plaintiff,**

v.

**PEERLESS CASUALTY COMPANY, a corporation, Defendant.**

No. 1777.

United States District Court
D. Montana,
Billings Division.

March 7, 1958.

R. G. Wiggenhorn, George J. Hutton, John M. Schiltz, John C. Sheehy, Billings, Mont., for plaintiff.

Rockwood Brown, Jr., Charles B. Sande, Weymouth Symmes, Benjamin N. Forbes, Rockwood Brown, Jr., Billings, Mont., for defendant.

PRAY, District Judge.

The plaintiff in the above entitled action is seeking reformation and correction of the amendment to the agreement attached to the Complaint filed herein, and heretofore entered into by the parties above named, or else to obtain an interpretation of the language in question, in order to express the true intent and meaning thereof.

From the factual situation it appears that the plaintiff was organized as a mutual casualty company in 1938 under the laws of the State of Montana by Walter M. McLaughlin, who has been, and continues to be, at all times herein men-

D.C.E.D.Pa.1940, 31 F.Supp. 506, affirmed, 3 Cir., 1940, 115 F.2d 102, 104, and cases there cited.

tioned, the President and General Manager thereof, and in addition thereto he also conducts a general insurance agency as General Agent for other insurance companies. The plaintiff company has been described as a small company with limited assets, and the defendant company as a very large insurance company, located in the state of New York and engaged extensively in the business of reinsurance. With alleged assets of about $50,000 it appears to have been necessary for plaintiff to obtain reinsurance in order to issue policies beyond the so-called basic limits. A policy to protect against bodily injury and property damage with the maximum limit of $5,000 for injury to one person and $10,000 for injury to two or more persons, and $5,000 for property damage is described as a basic limits policy. A standard manual or rate schedule issued by the National Bureau of Casualty Insurance Underwriters determines the rate to be charged for such policies. The same basic rate is also used to determine the premium for a policy issued for limits larger than the policy above described.

The same manual contains a schedule of factors or percentage rates, one for each combination of limits, such as "ten-twenty-five" as "fifty-one hundred-ten", the appropriate percentage or factor is then applied to the prescribed basic limits premium to determine the amount of premium that would be added to the basic limit premium to make up the full premium that would be charged for the policy. It appears that the final premium is the sum of the basic premium and the percentage thereof, determined by the appropriate factor.

The agreement in question here is dated March 13, 1951 and became effective April 1, 1951, and the amendment thereof is dated and became effective April 1, 1952.

It appears that defendant carried reinsurance for plaintiff prior to 1951, the relationship having begun in 1943 when the defendant company wrote the first contract or treaty for the plaintiff. All the negotiations preceding the making of the agreement in question, and later amendment thereof, were conducted by correspondence. Plaintiff refers to defendant's letter of February 27, 1951, which proposed a rewriting of the then existing contract and indicating changes suggested, and also to defendant's letter of March 14, 1951 enclosing the new contract, which, it is indicated, should not be confused with the later amendment of the new contract dated April 1st, 1952. The letter of February 27, 1951, in respect to the contract then in effect and the five-ten-five limits of coverage provided for reinsurance as set forth in detail therein, Counsel for plaintiff argue: "It is significant that in this letter it is represented that the application of the factor 100/60ths is to the losses incurred in this bracket". The bracket referred to is, of course, the basic limit of loss, that is to say, within the five-ten-five limits. Thus the recipient of the letter could only understand that the losses which would serve as a basis for determining the adjusted premium would be limited to losses incurred within the five-ten-five limits of coverage. Counsel claim there is no reference in the letter to any change in the new contract in regard to the premium to be charged for the excess losses, that is, the losses suffered above the basic limits.

Counsel goes into a lengthy discussion in his brief of the contract as affected by the subsequent amendment and the specific language directly in question here, a contention is that the purpose of reinsurance is to protect the primary insurer against excessive losses and, therefore, it is difficult to understand a plan wherein the insured is required to pay all of his losses with a further penalty of paying two-thirds thereof, all presented in the "guise of a premium for protection against the very losses thus paid".

Mr. Edward D. Sayer, Assistant Secretary of defendant, is credited with the authorship of the said contract and the amendment thereof and of the correspondence preceding the execution of

both instruments, which are all in evidence.

The quotation from defendant's letter of July 6, 1954, which was written in reply to plaintiff's letter of June 3rd seems to be of importance here and reads as follows: "As respects your comments on the Schiern case it is, of course, rather difficult to follow the transactions as they appear on the computation itself. Accordingly, I would like to draw your attention to the terms of Exhibits A and C. The experience formula under Exhibit A applied to the losses over a $5,000 retention which would be incurred on your policy coverage for basic $5,000/$10,000/$5,000 limits. Following this procedure the McMinn case of March 25, 1952 was not included in the experienced rating computation, since it did not involve Exhibit A at all, the same being under Exhibit B. However, the Schiern case comes under Exhibit C, and in this connection I would like to refer you to Paragraph A near the end of Section 4 of Exhibit C, appearing on page 18 of the treaty. You will note that the loss limit here relates to our losses arising from any one accident, and is not affected by the fact that a case may involve one or more claimants or may involve property damage as well as bodily injury".

Plaintiff's comment on this letter follows: "While difficult to discern just what the writer was trying to say, it may be fairly concluded that he admits that under Exhibit A, in determining the adjusted premium for basic limit insurance from time to time, the defendant had considered only losses within the basic limits and had excluded losses in excess of basic limits (the McMinn case referred to). In fact the letter says in referring to the previous Exhibit A, "the experience rating formula under Exhibit A, applied to the losses which would be incurred on your policy coverage for basic $5,000/$10,000/$5,000 limits". Note the words "$5,000/$10,000/$5,000 limits". Thus Mr. Sayer confirms that the words "total losses incurred", as used in Exhibit A, mean losses incurred within basic limits only, notwithstanding that the phrase "total losses incurred" is just as all embracing as "losses incurred under this Exhibit".

On September 24, 1954 plaintiff made the payment of $1,549.05 demanded by defendant, at the same time protesting against using the losses incurred under excess limits to determine the adjusted premium for basic limits. Plaintiff claims through Mr. McLaughlin that he was compelled to keep the existing contract in force until he could provide for reinsurance with other companies, hence he felt obliged to pay the sum demanded; if he had cancelled the contract, as its terms allowed, plaintiff would have been without reinsurance. Following plaintiff's notice of October 25, 1954 of cancellation of contract to become effective December 31, 1954, defendant notified plaintiff that the agreement filed with the Interstate Commerce Commission covering plaintiff's interstate carriers would also be cancelled, which was done, and which required plaintiff to cancel all its outstanding policies covering interstate carriers. Statements followed showing the aggregate losses charged by defendant to plaintiff to be the sum of $30,301.38, resulting in an adjusted premium charged in the sum of $50,502.30. Plaintiff claims his net assets are about $44,000, and that claim here sued upon is included therein. The amount of plaintiff's claim in suit is given at $41,544.18. Whatever the result here, an accurate accounting should be made.

A stipulation of Counsel for the respective parties appears on Pages 92 and 93 of the transcript in which it was "stipulated and agreed that proof of the account and of the items thereof as set forth in the complaint, as well as proof of the defendant's counter-claim, may be suspended and withheld, and that the cause may be submitted to the Court for present purposes upon the issue as to the true contract existing between the parties with especial reference to the question whether losses suffered or losses incurred by defendant in excess of the primary limits should be considered and

calculated in applying the factor 100/60ths to determine the adjusted premium on the primary or basic limit policies, and the parties do further agree that the Court may enter an Interlocutory Judgment or Order disposing and resolving the issue indicated, after which, if the parties can then not agree, based upon the formula put into effect by the Court's Interlocutory Order upon the account between them, that it may then be referred back to the Court for such appropriate termination and action either by referring to a Master or other reference as may seem to the Court expedient and proper."

The Court has studied the correspondence of the representatives of the parties to the action in order to find, if possible, the intent in using the language in question, since the correspondence, in the absence of any oral communications or factual dispute, might be expected to furnish the most informative and dependable source for the discovery of a reasonable clue to intent.

After reading and re-reading the correspondence the Court has been unable to find, in respect to the real issue here that either of the parties had any intention of changing the practice followed under Exhibits A and B of the original treaty by the adoption of the Amendment Exhibit C. If there had been any such intention so to change the relationship of the parties, on the part of Mr. Sayer, who drew both contracts, would not Mr. Sayer, an expert in matters of reinsurance, with many years responsible service with one of the largest insurance companies in the country, presumably acting fairly and honestly in his correspondence with Mr. McLaughlin, have fully explained his interpretation and the heavy increase in expense that would be imposed upon the latter. Of course, Mr. McLaughlin would not have agreed to the Amendment if he had known what construction and meaning Mr. Sayer would thereafter place on the language in question. The words aforesaid as they appear in the Amendment are susceptible of a double meaning and are,

therefore, ambiguous, but did the parties so intend them to be, and can it be gleaned from the correspondence that there was any intent on the part of the contracting parties to give the words there used any different meaning than that given like words in the contract before the Amendment was effected. To the Court it does not appear that any such change in meaning was intended, and therefore concludes that at the time and before the Amendment was finally agreed to Mr. Sayer did not then have in contemplation any such alteration or change in the relationship of the parties, in their dealing with each other, in respect to the issue here in controversy, as had since occurred. It seems almost inconceivable that Mr. Sayer could have stood by and urged the execution of an agreement, knowing that he intended to place such a construction on vital language therein as might result in the latter's financial ruin, when the same language was susceptible of an interpretation which would continue the practice that for a long time had been satisfactory to both parties.

In his testimony Mr. McLaughlin tells of assurances he believed had been given him and which influenced him in signing the Amendment. He refers to Mr. Sayer's letter of March 6th, wherein the following appeared: "Incidentally, the computation would be cumulative to the extent of including results under Exhibit A of the present Agreement", together with other references that he considered as indicating that no changes such as is now read into Exhibit C would be made.

An effort was made in the trial of the cause to show that Mr. McLaughlin was just as capable of taking care of himself in the insurance business as Mr. Sayer, although it clearly appears that Mr. Sayer has had many more years experience than Mr. McLaughlin and in a much larger field of practice in preparing insurance contracts and especially in matters of reinsurance. After hearing the testimony and reading the correspondence of these two representatives of the litigants herein, and after reading the

Contract and Amendment in question prepared by Mr. Sayer, one would have no difficulty whatever in discovering the master mind in this case. In comparing the knowledge and experience of Mr. McLaughlin with that of Mr. Sayer in the making of insurance contracts and particularly in the specialty matter of reinsurance, Counsel said in his brief referring to the former, "He was in no different situation and no better qualified to understand the intricacies and involvements of the serious and irrational instrument before us than is the ordinary person able to grasp and understand the ordinary insurance policy".

An officer of insurance companies with 36 years experience, Mr. Hjermstad, in testifying as an expert in respect to insurance and reinsurance contracts, said, referring to the contract in question here, "I might say it is a very unusual contract. I found a number of points in the contract I thought were quite unusual."

■ . There seems to be no question that contracts of reinsurance should be liberally construed in favor of the reinsured. Wade v. Victory Mut. Life Ins. Co., 316 Ill.App. 454, 45 N.E.2d 202. A quotation from Standard Reinsurance work by Kenneth K. Thompson, of the New York Bar, and a member of the Insurance Society of New York, Inc., concerning treaty reinsurance, might be of interest here: " * * * Unless, therefore, the two parties approach their treaty relations with complete confidence in each other's honesty and business ability, a treaty will prove a constant source of irritation and disappointment, or at least be short-lived." The basic principles of modern treaties may accordingly be summarized as follows:

1. The arrangement is mutually obligatory.

2. The reinsurer automatically follows in every respect the fortunes of the Ceding Company on every policy reinsured.

3. The Ceding Company must carry a net retention against each cession.

4. The arrangement is based, in the final analysis, entirely upon mutual trust. P. 69

Sec. 93–401–17 of R.C.M. 1947 provides: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret". See also Sec. 93–401–18 of R.C.M.

In Beneficial Fire & Casualty Insurance Co. v. Kurt Hitke & Co., 46 Cal.2d 517, 297 P.2d 428, 431, the Court said: " 'Parol evidence is also admissible to aid in the interpretation of an ambiguous contract or writing * * *. As the court said in California Employment Stabilization Commission v. Walters, supra (64 Cal.App.2d 554, 149 P.2d 17) "(t)he very fact, however, that the plaintiff questioned the meaning of certain words used in framing the agreement in itself showed that it was ambiguous. [Citation.]" ' * * * And: 'when the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties * * * not to show "that the parties meant something other than what they said" but to show "what they meant by what they said." * * * Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, nature and subject matter of the agreement * * *—as well as to subsequent acts or declarations of the parties "shedding light upon the question of the mutual intention at the time of contracting." * * *.' "

From the foregoing it seems apparent that the Court is of the opinion that the true intent and meaning of the parties in respect to the issue involved herein can be determined without recourse to refor-

mation of the treaty, or agreement, embodied in the Amendment aforesaid.

Taking into consideration the original contract and the Amendment thereof, the correspondence, the evidence, able arguments of Counsel on the law and facts, surrounding circumstances and likewise the long continued friendly relationship of the two representatives of the parties to the action in their dealings with each other, it does not seem to the Court that the language of the Amendment in question makes such a change in the basis of determining the adjusted and final premium on basic limit insurance as contended for by the defendant; and, accordingly, the Court, being duly advised and good cause appearing therefor, is now of the opinion that the plaintiff should prevail in the above entitled cause, and such is the Order and determination of the Court herein. An accounting may be made according to stipulation, and Findings of Fact and Conclusions of Law and form of Judgment be submitted.