PEERLESS CASUALTY COMPANY, a corporation, Appellant,

v.

MOUNTAIN STATES MUTUAL CASUALTY COMPANY, a corporation, and Walter M. McLaughlin, Appellees.

No. 16721.

United States Court of Appeals Ninth Circuit.

Sept. 19, 1960.

Sande, Symmes, Forbes & Brown, Billings, Mont., for appellant.

Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for appellee.

Before STEPHENS, BARNES and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Appellant Peerless Casualty Company appeals from a judgment rendered against it in the sum of $38,934.53 in an action filed by Mountain States Mutual Casualty Company and tried without a jury in the District Court of Montana. The District Court's jurisdiction was based upon diversity of citizenship, and this Court has jurisdiction under 28 U.S.C.A. § 1291.

Mountain States is a mutual casualty company, organized and doing business mainly in Montana, and engaged in writing automobile insurance policies. Peerless does a large volume of reinsurance business and was incorporated in New Hampshire.

On March 13, 1951, Peerless and Mountain States entered into a written agreement by which Peerless agreed to reinsure Mountain States for all losses over a fixed amount as a result of any one accident. The contract provided for Mountain States to pay Peerless a premium for such coverage, the details of which premium were set forth in Exhibits A and B attached to the policy. In the insurance business, a "basic limits" policy is one which provides coverage for loss, from any one accident, of $5,000 for injuries to one person, $10,000 for injuries to two or more persons, and $5,000 for property damage. It will be referred to herein as a 5/10/5 policy. Exhibit A provided for the coverage and the premium to be paid by Mountain States for coverage under this "basic limits" or 5/10/5 policy. The coverage under Exhibit A is set out in the footnote.[1]

Under Exhibit A the premium to be paid by Mountain States was set forth in Section 3, which read as follows:

"Premium:

"As premium for the reinsurance provided under this Exhibit, the Company shall pay to the Reinsurer Seven per cent (7%) of the net premiums (i. e., gross premiums less cancellations and returns) written by the Company in respects of basic $5000/10,000/5000 (including Medical Payments) limits of coverage on classes of business covered under this Exhibit.

---

[1].           "Exhibit 'A'
        *       *       *       *       *
                "Section 1
    "Cover:
    "As respects business of the Company (falling within the scope of the classes set forth in the title of this Exhibit and not hereinafter excluded), in force at and becoming effective. at and after 12:01 A.M., April 1, 1951, (including renewals) the Company shall retain for its own account liability for the first Five Thousand Dollars ($5000) of loss due to claims (relating to one or more policies and regardless of the number of Assured involved) arising out of each accident, whether such

claims involve any one or any combination of such classes of business; and the Reinsurer shall indemnify and reimburse the Company for all losses paid in cash by the Company in excess of said Five Thousand Dollars ($5000) as respects each accident, subject to a maximum liability to the Reinsurer of Ten Thousand Dollars ($10,000) as respects each accident. The foregoing reinsurance shall apply only to those claims resulting from any one accident which would have been covered had the Company issued its policies for Bodily Injury limits not greater than $5000/10,000 and Property Damage limit not greater than $5000."

"The foregoing premium is provisional, and shall be adjusted in the following manner:

"A. At the conclusion of each twelve-month period, or at the option of the Reinsurer any six-month period, commencing with the inception of this Agreement and continuing until all losses hereunder have been discharged, an adjusted premium shall be determined by application of the factor one hundred sixtieths (100/60ths) to the *Reinsurer's total losses incurred* (i. e., payments plus outstanding reserves for losses and loss expenses) from inception to the end of the period of accounting. Said adjusted premiums shall be balanced against all net premiums previously paid to or payable to the Reinsurer under this Section, and the net balance due either party shall be remitted forthwith:

"B. In no event shall the total ad-justed premium paid to or payable hereunder at any time exceed Ten and one-half per cent (10½%) net nor shall it be less than Five and one-fourth per cent (5¼%) net of the net premiums written by the Company in respect of basic $5000/10,000/5000 limits of coverage from the inception of this Agreement to the end of the period of accounting." [Emphasis added.]

Exhibit B attached to the contract provided for the reinsurance by Peerless of policies written by Mountain States above the basic limits of 5/10/5 and up to the limits of $100,000/100,000/25,000. These policies are called "excess limits" policies. The wording of this coverage in the contract was set forth in Section 1 of Exhibit B and is shown in the footnote.[2]

The premium to be paid by Mountain States to Peerless for the coverage on

2. "Exhibit 'B'

\* \* \* \* \*

"Section 1

"Cover:

"As respects Third Party Bodily Injury Liability (including Medical Payments) business of the Company (except as hereinafter excluded) in force at and becoming effective at and after 12:01 A.M., April 1, 1951 (including renewals) the Company will pay the amounts of loss, including damages for care and loss of services, arising out of bodily injury to or death of one person in any one accident (hereinafter called the 'First Limit') and, subject to the foregoing provision respecting each person, the amount of loss, including such damages, arising out of bodily injury to or death of two or more persons in any one accident (hereinafter called the 'Second Limit') set forth as 'Company's Retention', and the Company will reinsure with the Reinsurer on the excess basis and the Reinsurer will accept by way of reinsurance all excess loss above the primary loss paid by the Company, provided the loss to the Reinsurer shall not exceed the amounts set forth below as 'Maximum Amount to Be Reinsured With Reinsurer':

"As respects Property Damage Liability (i.e., legal liability of Assured for damage to property of others) business of the Company (except as hereinafter excluded) becoming effective at and after 12:01 A.M., April 1, 1951 (including renewals), the Company will pay the amount of loss for all damages rising out of any one accident, set forth below as 'Company's Retention', and the Company will reinsure with the Reinsurer on the excess basis and the Reinsurer will accept by way of reinsurance all excess loss above the primary loss paid by the Company, provided the loss to the Reinsurer on account of any one accident shall not exceed the amount set forth as 'Maximum Amount to Be Reinsured With Reinsurer':

| Class | Company's Retention | | Maximum Amount to Be Reinsured with Reinsurer | |
|---|---|---|---|---|
| | First Limit | Second Limit | First Limit | Second Limit |
| Third Party Bodily Injury (including Medical Payments) | $5,000 | $10,000 | $95,000 | $90,000 |
| Third Party Property Damage | $5,000 per accident | | $20,000 per accident" | |

the excess limits policies was set out in Section 3 of Exhibit "B", which reads as follows:

"Premium:

"As premium for the reinsurance provided under this Exhibit, the Company shall pay to the Reinsurer Seventy per cent (70%) with respect to Long Haul Trucking risks, and with respect to all other risks reinsured hereunder Sixty per cent (60%) of the amounts determined by applying to the premiums charged by the Company for basic $5000/10,000/5000 limits of coverage the factors contained in the appropriate excess tables of the Standard Manual of the National Bureau of Casualty and Surety Underwriters."

3.                              "January 22, 1952
"Peerless Casualty Company
  32 Cliff Street
  New York 7, New York
"Re: No. 1-281 Reinsurance agreement,
        March 13, 1951
        Mountain States Mutual Casualty
        Company. Case # 1777,
        Mountain States, etc. vs. Peerless
        Casualty Co.
"Gentlemen:
    "After reviewing our 1951 operations, we find that we cannot possibly make any money on our present reinsurance treaty, whereby we insure everything over $5,-000.00 straight through.
    "Together with this treaty and our excess treaty, we find we are paying out almost 25% of our premium for reinsurance and, therefore, we would like very much on the anniversary of our treaty, to carry 5/10/5 on our own and only reinsure excess.
    "Please let us know if this will be agreeable with your good company, as it is most imperative that we make such an arrangement.
            "Yours very truly,
                    "Mountain States Mutual
                          Casualty Company
"WMMC:er"

4.    "[Letterhead of Peerless Casualty
          Company Home Office, Keene,
                New Hampshire.]
    "Air Mail                March 6, 1952
    Mr. Walter M. McLoughlin
    Mountain States Mutual Casualty Company
    Billings, Montana

The above agreement of March 13, 1951, was to be effective from April 1, 1951, until terminated as provided therein.

In insurance parlance such a contract as we have referred to is called a treaty, and the term "retention" refers to the portion of the risk assumed by the primary insurer (Mountain States).

Commencing in January, 1952, Mountain States and Peerless communicated with each other by letter, looking to a change in their contract arrangements. All of the negotiations were by correspondence. On January 22, 1952, Mountain States wrote a letter to Peerless, set out in the footnote,[3] making certain suggestions for changes. On March 6, 1952, Peerless replied to Mountain States' suggestions, as shown in their letter set out in the footnote.[4] On March 25, 1952,

"Re:    Agreement    No.    1-281.    Case
        # 1777, Mountain States, etc.
            vs. Peerless Casualty Co.
"Dear Mr. McLoughlin:
    "We have finally completed our study of the above Agreement which you requested in your letter of January 22nd.
    "I do not have your 1951 volume figures so that I am not in a position to comment on your statement that you are paying out almost 25% of your premium for reinsurance. It does look as though in 1950 your reinsurance premium outlay was approximately 20% of your gross writings, although this figure included items other than our treaties, and our income was roughly half of your reinsurance ceded.
    "You probably would be best served by increasing your retention and we would be quite willing to revise the Agreement to provide you with a greater retention although not on the basis you suggest.
    "Our proposal for an increased retention would require a retention on your part of $7500 per accident based upon a combination of the Bodily Injury, Medical Payments and Property Damage costs arising from any one accident. We would suggest a cover of $125,000 in excess thereof based upon maximum Company policy limits of $50,000/100,000/25,000 plus Medical Payments. This coverage would contemplate the present excluded list and would include coverage on buses up to $25,000/50,000/25,000 on bus risks.
    "The rating of such a cover would be as follows:
    "A. 4% of your net writings for basic $5000/10,000/5000 limits including Medi-

Mountain States replied to this letter, the pertinent part of which reads as follows:

"If you would draw up the treaty on the basis shown in your letter and submit it to us, so that we may review all the provisions of it, then we will be in a position to either sign it or turn it down.

"One reason for this is that we are not clear on what you mean by Exhibit A and Exhibit B in your letter, as evidently it is used in two different manners.

"We shall look forward to receiving from you, a copy of the treaty as you think it should be written."

Peerless replied by its letter of April 2, 1952, as set out in the footnote.[5]

cal Payments. This premium would be provisional and would be subject to adjustment to a figure produced by applying the factor 100/60ths to our incurred losses (i.e., loss and loss expense payments plus outstanding loss and loss expense reserves) subject to a maximum premium equivalent to 166⅔% of the provisional premium and subject also to a minimum premium equivalent to 66⅔% of the provisional premium.

"As respects bus risks the provisional rate would be 6%. As respects the three single limit policies the 4% rate would be applicable to the basic $10,000 limit.

"Computations under the experience, rating plan would be made annually or at the end of any six month period at our option on a cumulative basis, i.e., each computation would apply from inception to the date of accounting. Incidentally, the computation would be cumulative to the extent of including results under Exhibit A of the present Agreement.

"In applying the loss modification factor, we would ignore any loss cost beyond the first $15,000 of our loss on any one accident, plus proportionate loss expense.

"B. Provided you have adopted the current National Bureau excess tables, we would be willing to continue the present scale for the table excess premiums, i.e., 70% of the manual table increased limits as respects long-haul truck risks and bus risks, and 60% of the manual table increased limits premiums as respects all other risks.

"You will note that the above experience rating plan differs in some respects from that incorporated in Exhibit A. As a matter of fact the plan set forth in Exhibit A proved to be defective in some respects and adjustments were made shortly thereafter to the plan outlined above and we actually wrote only two or three treaties on the basis of Exhibit A.

"You can, therefore, understand why we would not be particularly happy with the present Exhibits A and B and why we

would wish to bring the coverage into line with later developments.

"If it develops that you decide eventually to maintain the $5000 retention, we would be willing to substitute the above plan for that presently set forth in our Agreement at the provisional rates of 10% on buses and 7% on all other business.

"It would be most desirable that any change be adopted at the April 1st anniversary with the change applicable to business in force at that date.

"There would be no change in the body of the treaty, whichever plan you decide to adopt. The change would be made by endorsement cancelling Exhibits A and B and substituting a new Exhibit C outlining the coverage as finally decided.

"Very truly yours,
"/s/ E. D. Sayer,
Assistant Secretary
"EDS:MT"

5. "[Letterhead of Peerless Casualty Company Home Office, Keene, New Hampshire.]
`[Stamped]: Received April 5, 1952. Mountain States Agency, Billings, Mont.
April 2, 1952.
"Mr. Walter M. McLoughlin, President Mountain States Mutual Casualty Company
Billings, Montana
"Re: Agreement No. 1-281. Case # 1777, Mountain States, etc. vs. Peerless Casualty Co.
"Dear Mr. McLoughlin:
"Thank you very much for your letter of March 25.
"I am enclosing Exhibit C to be added to the Agreement, plus Endorsement No. 2 which makes the transfer of coverage from the old Exhibits to Exhibit C, plus Endorsement No. 3 which makes certain necessary changes in Article IX of the Agreement.
"You will note that I have drawn Exhibit C on the basis of a $7,500. combination retention. I have done this on the assumption that your anticipated in-

Mountain States' reply of April 9, 1952, is shown in the footnote.[6]

Thereafter, Exhibit C was prepared by Peerless, forwarded to Mountain States, executed by the parties, and attached to the contract dated March 13, 1951. Pertinent portions of Exhibit C are set out in the footnote.[7]

crease in volume will make a higher retention attractive and it is not my intention to imply that our quotation for excess coverage over a $5,000. retention is no longer available. If your final decision is to retain $5,000. we shall be glad to rewrite Pages 15 and 17 to reflect the $5,000. retention. I would like to ask that you consider this matter promptly so that we may have a complete Agreement as soon as possible.

"Endorsement No. 2 calls for a return of the pro rata portion of the unearned premium under Exhibits A and B and Exhibit C shows the premiums attaching on an in force basis. This is necessary because of the change in rates. If you eventually decide to retain $5,000, we shall not expect you to go through the mechanics of changing over to in force. In that event we should merely transfer fifty per cent of the last twelve months premium writings from the old Exhibits to Exhibit C.

"I trust that you will find the new Exhibit to be satisfactory in all respects.

"Very truly yours,
"/s/ E. D. Sayer,
Assistant Secretary
"EDS/jd
Encls."

6.  "[Letterhead of Mountain States Mutual Casualty Co. Home Office, Billings, Montana.]
[Stamped]: Received April 11, 1952. Peerless Casualty Co., New York Office.
April 9, 1952
"Peerless Casualty Company
32 Cliff Street
New York 38, New York
"Re: Agreement # 1–281. Case # 1777, Mountain States, etc. vs. Peerless Casualty Co.
"Dear Mr. Sayer:
"We have studied the Agreement you have sent to us and after going over the $7500 retention provisions thoroly, we feel that we should not accept such a retention at the rates shown in your letter of March 6th, but would rather accept the $5000 retention as stated in the third from the last paragraph. Namely, to substitute the $5000 retention in the plan outlined at the provisional rates of 10% on buses and 7% on all other business.

"If you will then rewrite pages 15 and 17 to reflect the $5000 retention, we will

sign and return it immediately upon its receipt here.

"We thank you very much for your patience in this matter, but, as we outlined before, we had made inquiry early so that we could have ample opportunity to go into the matter thoroly before making any change.

"Yours very truly,
"Mountain States Mutual Casualty Company,
"/s/ Walter M. McLaughlin
"WMMc:er"

7.  "Exhibit 'C'
"Excess Reinsurance of
"Third Party Bodily Injury Liability (including Medical Payments) and Property Damage Liability Insurance Business.
"Section 1
"Cover:
"As respects business of the Company (falling within the scope of the classes set forth in the title of this Exhibit) in force at and becoming effective (including renewals) at and after 12:01 A.M., April 1, 1952, the Company shall retain for its own account liability for the first Five Thousand Dollars ($5,000) of loss due to claims (relating to one or more policies and regardless of the number of insureds involved) arising out of each accident, whether such claims involved any one or any combination of such classes of business, and the Reinsurer shall indemnify and reimburse the Company for all losses paid in cash by the Company in excess of said Five Thousand Dollars ($5,000) as respects each accident, subject to a maximum liability of One Hundred Twenty-five Thousand Dollars ($125,000) to the Reinsurer as respects each accident. The foregoing reinsurance shall apply only to those claims resulting from any one accident which would have been covered had the Company issued its policies for limits not greater than the following:
"Comprehensive Personal Liability, Farmers' Comprehensive Personal Liability, and Storekeepers' Liability business— $100,000.
"All other Bodily Injury business— $100,000/100,000.
"All other Property Damage business— $25,000.
*    *    *    *    *
"Premium:
"As premium for the reinsurance pro-

Exhibit C covered the matters formerly covered under Exhibits A and B. It was agreed that Exhibit C should become effective as of April 1, 1952, and Exhibits A and B were cancelled as respects accidents occurring after said date.

It will be noted that in Exhibit A, which referred to the basic limits 5/10/5 policies, the premium provided for was provisional and subject to periodic adjustment by multiplying "reinsurer's total losses incurred" by the factor of

100/60ths, subject to the further adjustment that the adjusted premium should not exceed 10½% nor be less than 5¼% of the net premium received by Mountain States for 5/10/5 policies.

It will also be noted that in Exhibit B, which referred to policies having excess coverage over the 5/10/5 limits and up to $100,000/100,000/25,000, the premium was not provisional, but was set at 70% of the premium received by Mountain States for long haul risks and 60% of the premium received by Mountain

vided under this Exhibit, the Company shall pay to the reinsurer the following:

"1. As respects Long Haul truck and Bus risks, Ten per cent (10%) net of the net premiums (i.e., gross premiums less cancellations and returns) written by the Company in respect of basic $5,-000/10,000/5,000 limits of coverage including Medical Payments, plus

"2. As respects all other business covered hereunder, Seven per cent (7%) net of the net premiums (i.e., gross premiums less cancellations and returns) written by the Company in respect of basic $5,000/10,000/5,000 limits of coverage including Medical Payments, (or, as repects Comprehensive Personal Liability, Farmers' Comprehensive Personal Liability and Storekeepers' Liability business, basic $10,000 limit) on classes of bodily injury, medical payments and property damage business not hereinbefore excluded, plus

"3. As respects Long Haul Truck and Bus risks, Seventy per cent (70%) net of the amounts determined by applying to the premiums charged by the Company for basic $5,000/10,000/5,000 limits of coverage the factors contained in the appropriate excess tables of the Standard Automobile Manual of the National Bureau of Casualty Underwriters (or excess tables and rates promulgated by State or other recognized authorities and approved by the Reinsurer) for limits in excess of said basic limits, plus

"4. As respects all other bodily injury and property damage business not set forth in Paragraph 2 of this Section, Sixty per cent (60%) of the amounts determined by applying to the premiums charged by the Company for basic $5,000/10,000/5,000 limits of coverage (or, as respects Comprehensive Personal Liability, Farmers' Comprehensive Personal Liability and Storekeepers' Liability business, the premium charged by the Company for basic $10,000 limit) the

factors contained in the appropriate excess tables of the Standard Manuals of the National Bureau of Casualty Underwriters (or excess tables and rates promulgated by State or other recognized authorities and approved by the Reinsurer) for limits in excess of said basic limits.

\* \* \* \* \*

"The premium set forth in Paragraphs 1 and 2 of this Section is provisional, and shall be adjusted in the following manner:

"A. At the conclusion of the period ending March 31st, 1952 and of each twelve month period (or at the option of the Reinsurer any six month period) thereafter, commencing with the inception of this Agreement and continuing until all losses hereunder have been discharged, an adjusted premium shall be determined by the application of the factor one hundred sixtieths (100/60ths) to the *Reinsurer's total losses incurred under this Exhibit* (i.e., the sum of payments plus outstanding reserves for losses and loss expenses) from inception to the end of the period of accounting provided, however, that in no case shall said factor be applied to any sum greater than Fifteen Thousand Dollars ($15,000), plus proportionate loss expense, as the result of any one accident. Said adjusted premium shall be balanced against all net premiums previously paid by the Reinsurer under Paragraphs 1 and 2 of this Section and the net balance due either party shall be remitted forthwith.

"B. In no event shall the total adjusted premium paid or payable under Paragraph A above at any time exceed One Hundred Sixty-six and Two-thirds per cent (166⅔%) nor shall it be less than Sixty-six and Two-thirds per cent (66⅔%) of the sum of provisional premiums under Paragraphs 1 and 2 above from the inception of this Agreement to the end of the period of accounting."
[Emphasis added]

States for "all other risks." The premiums received by Mountain States for these excess limits policies were determined by adding to the basic 5/10/5 premiums an additional amount "determined by applying to the premiums charged by the company for basic $5000/-10,000/5000 limits of coverage the factors contained in the appropriate excess tables of the Standard Manual of the National Bureau of Casualty and Surety Underwriters."

When Exhibit C was prepared by Peerless and later attached to the original contract as Exhibit C, it covered in the one exhibit all of the coverage to be afforded by Peerless to Mountain States, both on the 5/10/5 policies and on the excess limit policies. It provided in Section 4 for the premiums to be paid by Mountain States for the reinsurance coverage given by Peerless. Paragraphs 1 and 2 of Section 4 referred to premiums to be paid on the basic limits 5/10/5 policies, and Paragraphs 3 and 4 set out the premiums to be paid for the excess limit policies.

It will also be noted that Section 4 provided that the premiums mentioned in Paragraphs 1 and 2 of Section 4 were provisional and subject to adjustment, but the premiums set forth in Paragraphs 3 and 4 were fixed and not subject to adjustment.

The dispute in this case narrows down to the two different interpretations placed by the parties on the part of the contract providing for adjustment of the provisional premiums on the 5/10/5 policies.

Peerless contends that in determining "reinsurer's total losses incurred" there should be added to the losses incurred on the 5/10/5 policies the losses incurred on the excess limits policies, and that the total should then be multiplied by 100/60ths to ascertain the premium to be paid by Mountain States.[8]

Mountain States contends that "reinsurer's total losses incurred" means only those losses resulting from the reinsuring of the basic limits 5/10/5 policies, and that it was never intended by the parties that the losses upon the excess limit policies should be included in the figure that was to be multiplied by the factor 100/60ths to obtain the amount of premium owed by Mountain States to Peerless.

It is admitted by both parties that while Exhibit A of the parties' treaty was in effect, up until April 1, 1952, only the reinsurer's losses from its reinsurance of the 5/10/5 policies was considered in adjusting the provisional premium. Peerless contends, however, that this was changed when Exhibit C was adopted and attached to the treaty and Exhibits A and B were removed therefrom.

There was no dispute between the parties over the interpretation of Exhibit C until it had been in effect for over two years.[9]

---

8. This is subject to the limitation that the factor of 100/60ths would not be applied to any loss over $15,000 on any one accident, and, of course, the further limitation that in no event would the premium exceed 1⅓ nor less than ⅔ of the provisional premiums.

9. It appeared that on May 5, 1953, Peerless computed the premium due by Mountain States for the year ending April 1, 1953, and sent to Mountain States a refund of $3,192.36. This occurred because during that year there were no losses over Mountain States' retention of $5,000 and Mountain States was entitled to a refund under the provisional formula since the minimum premium applied.

However, on June 1, 1954, Peerless sent the next annual experience rating computation to Mountain States. This showed that during the preceding fiscal year substantial losses had been paid by Peerless over Mountain States' retention and that therefore Peerless was entitled to additional premiums under the provisional formula. In determining the additional premium due, Peerless included in the formula all losses incurred by Peerless, whether they arose from losses under the 5/10/5 limits policies or whether they arose from the excess limits policies.

Mountain States immediately replied by letter of June 3, 1954, complaining of the method of computation used by Peerless.

At that time Peerless demanded a premium from Mountain States based upon its interpretation of the treaty. Mountain States objected promptly, but when no agreement was reached between the parties, Mountain States gave notice of the cancellation of the treaty (as provided therein) and the treaty was terminated as of December 31, 1954.

Mountain States thereafter filed in the Montana State Court a complaint setting forth its contentions as to the agreement between the parties. Among other things it alleged that it was the intent of the parties that the premium to be paid by Mountain States for reinsurance for excess limits policies was a final and fixed premium and was not to be adjusted, and that in adjusting the premium for basic limits policies the losses suffered beyond the basic limits were not to be considered. It further alleged in substance that any language in the treaty that indicated that excess limits losses were to be considered in adjusting basic limits policy premiums was placed in the treaty by Peerless and that said language "was so used and inserted into the said amendment either by the mutual mistake and inadvertence of both parties thereto, or by mistake on the part of the plaintiff and the fraudulent and inequitable conduct of the defendant * * *." It further alleged that if the language was to be construed as contended for by Peerless "said words would serve to exact from plaintiff resulting premiums so excessive and unreasonable as to become unconscionable."

The complaint, after setting out in detail the amounts claimed to be due to it by Peerless under its interpretation of the contract, ended with the following prayer:

"Wherefore, Plaintiff prays judgment:

"1. That the said amendment to said agreement (Exhibit B attached hereto) be reformed and corrected to express the true intent and meaning of the said parties as herein stated and alleged.

"2. For a proper accounting to the plaintiff for the moneys due and payable to plaintiff under the terms of said agreement.

"3. Upon said accounting that said plaintiff be awarded judgment in the sum as above stated, being the total aggregate sum of $45,839.-42.

"4. For such other relief as to the court may seem meet and equitable and for plaintiff's costs herein expended."

On the motion of Peerless the case was transferred to the United States District Court for the District of Montana upon the ground of diversity of citizenship.

After a trial before the District Court without a jury a judgment was rendered upholding Mountain States' interpretation of the treaty (but without ordering reformation), and the Court decreed that Peerless should account to Mountain States for such moneys as might be due to Mountain States in accordance with its interpretation of the treaty.

The District Court in his opinion analyzed in detail the original contract, the correspondence between the parties, and the amendment to the contract which was signed after this correspondence. The Court stated that he had been "unable to find, in respect to the real issue here that either of the parties had any intention of changing the practice followed under Exhibits A and B of the original treaty by the adoption of the Amendment Exhibit C." With this statement we agree. Under Exhibit A the factor of 100/60ths was to be applied to *"Reinsurer's total losses incurred* (i. e., payments plus outstanding reserves for losses and loss expenses) * * *."* to determine the adjusted premium upon basic limits policies that were reinsured by Peerless, and the parties themselves interpreted this to mean total losses incurred only on basic limits policies. [Emphasis added.].

In Exhibit C, where it was provided that only basic limits policies' premiums were provisional (which was the same

situation as in Exhibit A) and where the method of adjusting such premiums was set out, practically the identical words were used as were used in Exhibit A. It was said in Exhibit C:

"An adjusted premium shall be determined by the application of the factor 100/60ths to the *reinsurer's total losses incurred* under this exhibit (*i. e.*, the sum of payments plus outstanding reserves for losses and loss expenses) * * *." [Emphasis added.]

The only new words that are found in the above quotation which were not in Exhibit A are the words "under this exhibit." Nowhere is there found in any of the correspondence from Peerless anything indicating that the manner of adjusting the premium on basic limits policies was to be changed by including in the losses incurred not only the losses incurred under the basic limits policies but also the losses incurred under the excess limits policies.

The evidence disclosed that when Mountain States received a premium from a policy holder it paid 25% of that premium to the writing agent and 10% of the premium to a general agent. This left Mountain States with 65% of the premium received. However, under the terms of the treaty with Peerless it agreed to pay Peerless 70% of the premiums received for excess insurance on long haul truck and bus risks and 60% of the premium received upon all other excess business. Thus, in the cases of buses and trucks, Mountain States was paying 5% more than it had received as a premium, and in the case of other excess risks it was paying out to Peerless all except 5% of what it received as premiums.

The rates to be received for excess limits policies were determined as set out "in the appropriate excess tables of the Standard Automobile Manual of the National Bureau of Casualty Underwriters * * * for limits in excess of said basic limits * * *." It is reasonable to infer that the rates so fixed would be sufficient to cover the risks assumed.

Under Peerless' interpretation of Exhibit C it would thus receive all (or nearly all) of the premium received by Mountain States on the excess limits policies, and in addition would be permitted to use its losses on excess limits policies to increase the premium it should receive on basic limits policies. Such a construction of the parties' amended contract would be a vital change from the prior practice of the parties and, according to Mountain States, would substantially increase its premiums to Peerless.

The District Court held that the amended contract was ambiguous, but was unable to find from all of the evidence that there was "any intent on the part of the contracting parties to give the words there used any different meaning than that given like words in the contract before the Amendment was effected." [160 F.Supp. 306].

The District Court stated, "It seems almost inconceivable that Mr. Sayer [of Peerless] could have stood by and urged the execution of an agreement, knowing that he intended to place such a construction on vital language therein as might result in the latter's financial ruin, when the same language was susceptible of an interpretation which would continue the practice that for a long time had been satisfactory to both parties."

The Montana Statutes (Revised Codes of Montana, 1947) set out certain rules governing interpretation of contracts.

"13-709. A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done, without violating the intention of the parties."

"13-707. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

"13-714. However broad may be the terms of a contract, it extends only to those things concerning

which it appears that the parties intended to contract."

"13–716. Particular clauses of a contract are subordinate to its general intent."

"13–719. Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected."

"13–710. The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."

"13–703. For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied."

"13–704. The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

"13–705. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this chapter."

"93–401–17. For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

"93–401–18. The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular in-stance, in which case the agreement must be construed accordingly."

As provided in the Montana Statutes, the District Court in this case considered the evidence of the parties and all the surrounding circumstances, as well as the language used in the original contract and that used in the amendment to the contract.

■■ As was said in Beneficial Fire & Casualty Ins. Co. v. Kurt Hitke & Co., 46 Cal.2d 517, 297 P.2d 428, at page 431,

"When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties * * * not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said.' * * * Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, nature and subject matter of the agreement * * *— as well as to subsequent acts or declarations of the parties 'shedding light upon the question of their mutual intention at the time of contracting.' * * *."

To the same effect see Davis v. Park Securities Corp., 1945, 117 Mont. 393, 159 P.2d 323; New Home Sewing Mach. Co. v. Songer, 1931, 91 Mont. 127, 7 P.2d 238; Bruckner-Mitchell v. Sun Indemnity Co. of New York, 65 App.D.C. 178, 82 F.2d 434; Tokio Marine & Fire Ins. Co. v. National Union Fire Ins. Co., 2 Cir., 91 F.2d 964.

While the prayer of the complaint of Mountain States asked, among other things, that the contract be reformed, the Court in its opinion stated "that the true intent and meaning of the parties in respect to the issue involved herein can be determined without recourse to reformation of the treaty or agreement, em-

bodied in the Amendment aforesaid."
[160 F.Supp. 307] The complaint contained sufficient allegations to raise the question of interpretation, and the District Court's disposition of the case was entirely proper. Fed.Rule Civ.Proc. 8 (f), 28 U.S.C.A. The body of the complaint asked for an accounting from the defendant of the moneys due to plaintiff according to its interpretation of the contract, and the Court granted such an accounting.

We hold that the findings of fact of the District Court in favor of Mountain States are supported by substantial evidence and that its conclusions of law therefrom are in accordance with law. The judgment of the District Court is affirmed.