ASHEVILLE MICA COMPANY, Eugene Munsell & Co., and Schwab Brothers Corporation, Plaintiffs-Appellants,

v.

COMMODITY CREDIT CORPORATION, Defendant-Appellee.

MANCHARD TRADING CORPORA-TION, Plaintiff-Appellant,

v.

COMMODITY CREDIT CORPORATION, Defendant-Appellee.

UNITED MINERAL & CHEMICAL CORP., and Sigbert Loeb, Plaintiffs-Appellants,

v.

COMMODITY CREDIT CORPORATION, Defendant-Appellee.

No. 430, Docket 28670.

United States Court of Appeals Second Circuit.

Argued April 21, 1964.

Decided Aug. 4, 1964.

13. A bill by Senator Hruska, S. 823, is under consideration in the Senate Judiciary Committee.

George Trosk, New York City, for plaintiff-appellant, Schwab Brothers Corp.

Alfred P. Walker, New York City, for plaintiffs-appellants, Asheville Mica Company, Eugene Munsell & Co. and Manchard Trading Corporation.

Joseph Eisinger, New York City, for plaintiffs-appellants, United Mineral & Chemical Corp., and Sigbert Loeb.

Eugene R. Anderson, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, on the brief) (Arthur M. Handler, Asst. U. S. Atty., and Robert M. Bor, Attorney, United States Dept. of Agriculture, of counsel), for defendant-appellee, Commodity Credit Corp.

Before WATERMAN, KAUFMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

These are appeals from a judgment in three consolidated cases which were briefed and argued together. The six appellants are among the largest importers of mica into this county. For many years, up to 1956, all held contracts with the General Services Administration (GSA) for the sale of mica, which was used in the strategic stockpiling program. During the summer of 1956, they entered into contracts with the defendant Commodity Credit Corporation (CCC) for the delivery of block and film mica and mica splittings of Indian origin over a two year period ending June 30, 1958,[1] in exchange for surplus agricultural commodities owned by CCC. Except for variations in the quantity of mica to be delivered, and the value of the agricultural commodities to be received in payment for them, the contracts were identical in all material respects.

The principal controversy between the parties concerns the "exchange value" term of the contracts. The prices for the various grades and qualities of material were specified in section 2.m. of the barter contracts, and CCC has paid the contractors in accordance with that schedule. Appellants claim, however, that they are entitled to higher prices in accordance with section 2.b.(1) of the barter contracts which reads as follows:

"b. Exchange Value

"(1) The exchange value per pound of mica delivered at Harborside Warehouse, 34 Exchange Place, Jersey City 2, New Jersey, ex duty, shall be based on the prices per pound for kinds, color, grades and qualities as shown in Section 2.m., 'Schedule of Mica Prices': Provided, * * * That in the event the General Services Administration, hereinafter referred to as 'GSA' and the contractor should by agreement increase or decrease the unit prices under GSA's purchase contracts with the contractor for block and film mica of Indian origin, (currently those shown in Section 2.m. hereof), such adjusted prices shall be used in determining the exchange value of block and film mica accepted under this contract when such adjusted prices are in effect. For the purpose of this provision, the date of acceptance shall be the date of GSA

---

1. The time for delivery was later extended to December 30, 1958.

Inspection Report to the contractor, showing the net weight, quality and grade of mica accepted * * * "

Briefly, all the appellants except United Mineral and Chemical Corporation, contend that, when the General Services Administration entered a new purchase contract with Loeb, on December 2, 1957 reflecting higher prices for most of the items than were specified in the barter contracts, they became entitled to higher prices for all mica subsequently accepted. United claims such higher prices only from the date of its own new purchase contract with GSA which was dated January 16, 1958. Three of the other four appellants, all except Manchard Trading Corp., entered into new purchase contracts with GSA, containing basically the same price terms as the new Loeb contracts, during May 1958.

The CCC, on the other hand, contends that the clause applied only to price changes which GSA might have made in its contracts with the appellants that existed at the time the CCC contracts were entered into. Since GSA did not extend the life of its old contracts, as it had done in the past, but instead executed new contracts with appellants, CCC claims that the "escalator" clause had no further effect.

After a trial without a jury, Judge Leibell decided in favor of the defendant on the contract interpretation issue. Although noting that virtually all of the testimony, from the representatives who conducted negotiations on both sides, was to the effect that they did not intend to limit the effect of the escalator clause only to extensions of the existing GSA contracts, he held that the language of the clause was so clear on its face as to preclude resort to oral testimony regarding the parties' intentions. At the same time, he passed on and rejected on the merits an antitrust defense interposed during trial, based on the contention that the defendants conspired to fix the ratio of mica splittings to block and film mica in the contracts and to have the price escalation provision inserted into them.

The last point now before us is the disposition of CCC's counterclaims against two of the appellants, Asheville Mica Co. and Schwab Bros. Corp. Judge Leibell granted judgment for the CCC on the counterclaims, in the sum of $8,795.06 and $46,672.32 respectively, plus interest in each case. The basis of the counterclaims was appellants' alleged failure to deliver mica having the average exchange value of $4.00 per pound, as provided for in section 2.b.(2) of the contract. We shall discuss these questions more fully after disposing of the plaintiffs' claims and the antitrust defense.

I. *The Contract Interpretation Issue.*

■ We cannot accept the District Court's view that the meaning of clause 2.b.(1) of the barter contracts is so evident on its face as to bar the interpretation contended for by the plaintiffs. The court erred in disregarding all the oral testimony and documentary evidence proffered by the plaintiffs, in reaching its conclusion as to the effect of section 2.b.(1) of the barter contracts. The better rule is that such evidence is always admissible where relevant to the interpretation of a contract, for the parol evidence rule—that extrinsic evidence is not admissible to vary or contradict the terms of a written contract—comes into operation only when the meaning of that which may not be varied or contradicted is determined. See 3 Corbin, Contracts (1960 Ed.) § 579; Arnold Prods., Inc. v. Favorite Films Corp., 298 F.2d 540 (2 Cir. 1962); Peerless Casualty Co. v. Mountain States Mut. Casualty Co., 283 F.2d 268 (9 Cir. 1960); Tobin v. Union News Co., 18 A.D.2d 243, 239 N.Y.S.2d 22 (4 Dept. 1963), affd. 13 N.Y.2d 1155, 247 N.Y.S.2d 385, 196 N.E.2d 735 (1964); Garden State Plaza Corp. v. S. S. Kresge Co., 78 N.J.Super. 485, 189 A.2d 448, 454 (1963). The provision in question is not wholly unambiguous, for the clause does not by its terms relate solely to "existing" contracts between the plaintiffs and GSA.

■ Finally, the District Court relied on some extrinsic evidence in reaching

its conclusion on the proper interpretation of section 2.b.(1). This was a telegram on April 4, 1956 from Earl M. Hughes, CCC's Executive Vice President, to Asheville accepting an offer to supply 35,000 pounds of block and film mica. The telegram contained a sentence that "the exchange value * * * will be based on the unit prices * * * currently in effect under purchase contracts you have with General Services Administration, subject to any increase or any decrease in said prices effective as of the dates any such contract price changes are agreed to in writing by GSA." The court felt that "the telegram formed the basis for the language used in section 2.b.(1) of the mica barter contracts * * *" It also considered certain letters between officials in GSA and those in CCC, during March 1956, in reaching its conclusion. Having considered the letters and telegrams, we think it was necessary also for the Court to consider the deposition of Clifford H. McClain, the chief of the CCC branch who negotiated the contract and drafted the telegrams and letters for the CCC, as to what was intended by them, as well as other correspondence and testimony in the record. There is no preferential rule for parol evidence.

McClain's testimony was clear that the telegram's reference to the existing contract was for the purpose of identifying the voluminous pricing schedules of the various types of mica already being purchased by GSA, and which would be acquired by CCC under the barter contract. He flatly stated that he did not intend the language to limit price changes under the barter contracts to changes in GSA contracts in existence at the time they were executed. Mr. McClain, Mr. Crim of the GSA, and the various officials of the plaintiffs all testified without contradiction that the purpose of the "escalator" clause was to assure price parity among the various contractors, in view of the facts that the mica market was extremely sensitive, and that even a slight difference in price might result in the loss of supplies to contractors who could not meet it. It was also made clear at the trial that the escalator clause was proposed by officials of the GSA who were advising CCC in instituting the latter's mica procurement program. In fact, all the mica which CCC acquired through the barter contracts was later turned over to GSA, which stockpiled it.

The CCC has given no convincing argument for reading this provision in the narrow and technical way it urges. It seems clear that the purpose of the "escalator" clause was to preserve price parity between the mica acquired by GSA and that by CCC. If so, it would surely defy reason to hold that different conseqeunces should flow from a formal decision by GSA, not a party to this contract, to enter into new contracts with its suppliers rather than extend the life of the old ones. The testimony of the men who participated in the negotiations and drafting of the contracts that such result was not contemplated is most persuasive.

To be sure, CCC does points to certain differences between the old and new GSA contracts with a view toward showing that it would be inequitable to make the prices it has to pay depend on the latter. Thus, it urges that such facts as a price increase of 20% granted by GSA in 1954 for Brazilian mica but not Indian mica, and the presence of special price terms in the new GSA contracts for certain suppliers[2] work to deny a policy of price uniformity. However, all these discrepancies were convincingly explained by the trial testimony. Thus, the purpose of the 1954 increase for Brazilian mica was to compensate suppliers there for higher wages to their employees, made necessary by a general order of the Brazilian government. Again, the various special price provisions in the new GSA contracts with certain of the plaintiffs simply meant that, because they were in default in deliveries under the old contracts, the initial quantities of mica delivered un-

2. These were Munsell, Schwab, and United.

der the new contracts would be at the old, lower price. The CCC's evidence falls far short of demonstrating that price uniformity between the GSA and CCC contracts was not an expectation of the parties, or that the GSA decision to make new contracts was in any way significant for this purpose. What we have said thus far indicates that we believe that plaintiffs Loeb and United proved their case to the extent that judgment against them was erroneous. The contentions of the other appellants, however, raise a rather different question. The language of clause 2.b.(1) in all the contracts refers to agreements between GSA and the "contractor," and the term "contractor" is specifically defined as the particular contracting party. It is evident that to adopt the construction argued for by Asheville, Schwab, Munsell and Manchard, and hold that their right to higher prices accrued not from the date of their own new contracts but from the date of Loeb's, requires considerably more by way of interpretation than to adopt Loeb's and United's version of the agreement. Because of the District Court's view of section 2.b.(1) it did not reach this issue, or several other points raised in the pre-trial order which was entered on September 27, 1962 and fixed, among other things, the issues to be decided by the trial judge. We believe that, since the case must be remanded for determination of these points, .it would be best to have its views on this question of fact, subject to our later review limited to whether the finding as to what was intended was "clearly erroneous." We remand for further findings on this issue.

## II. *The Anti-Trust Defense.*

█ The anti-trust defense was first raised in an amended answer served after the commencement of the trial. Alleged, in essence, was that the plaintiffs, together with two other mica suppliers, conspired to fix the ratio of the less valuable mica splittings to block and film mica provided in the contract, and to obtain the price escalation clause. Judge Leibell rejected this defense in its entirety after trial, and we agree with his disposition of it.

CCC concedes that it fixed the prices to be paid under the contract, and concedes also that the contracts were not awarded on the basis of competitive bidding. In fact, as early as September 12, 1955, a letter from a GSA official to CCC recommended that "in order to avoid exclusive control," the contracts should be "distributed to at least three or more of the experienced mica importing companies, and that 20% of the value of mica delivered under the barter contracts consist of block and film mica, as well as mica splittings." The CCC's evidence of conspiracy consists principally of statements made by some of the plaintiffs' witnesses at the trial that they had conversations with officers of the other mica companies in regard to the ratio and escalation clauses. There was virtually no evidence in the form of contemporaneous documents or memoranda showing unlawful agreement. By contrast, there was evidence that GSA counseled inclusion of the price escalation provision as early as September 1955, and that the ratio of splittings to block and film mica was vigorously negotiated and had, in effect, to culminate in a single ratio for all contractors in order to preserve price parity. In the light of these facts, the CCC fell far short of establishing its case as a matter of law.

## III. *The CCC's Counterclaims.*

The counterclaims in this action are asserted against only two of the plaintiffs, Asheville and Schwab. They are based on the conceded breach of section 2.b.(2) (a) of the barter contracts, which reads:

"LIMITATIONS ON GRADES, QUALITIES AND EXCHANGE VALUE OF MICA ACCEPTABLE.

"(a) The block mica and film mica acceptable under the terms of this contract shall be of such grades and qualities as will have an average exchange value as provided in (1) above of not less than $4.00 per pound."

Although obligated to deliver block and film mica of an average exchange value of no less than $4.00 per pound, Asheville in fact delivered mica having an average exchange value of only $3.48 per pound, and Schwab delivered mica having an average exchange value of only $3.34 per pound, at the prices fixed in the contracts. This deficiency was made up by CCC's drawing on the letters of credit which plaintiffs furnished them, in the amounts of $11,920.52 and $88,-767.47 respectively.[3] The counterclaims now being asserted derive, however, from the fact that the market price of mica increased between the date of the contracts and the date of the last deliveries. The CCC claims that the average increase in market prices up to the last date of delivery was 20.564 percent— in other words that it was entitled to mica having an average value of about $4.82 per pound. In fact the mica delivered had an average market value of only about $3.70 per pound in the case of Asheville and $3.82 per pound in the case of Schwab. The claims now asserted are the differences between the increment to which CCC claims it was entitled, and the actual increment in value of the mica which was delivered. In tabular form, the computations are as follows:

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| Asheville ... | 92,292.20 | 111,271.17 | 80,371.68 | 90,555.59 | 11,920.52 | 8,795.05 |
| Schwab .... | 538,488.00 | 649,222.67 | 449,720 54 | 513,782.89 | 88,767.47 | 46,672.32 |

*Legend*

A—Value of deliveries if they had an average exchange value of $4.00 per pound.

B—Value of mica delivered if it had an average exchange value of $4.00 per pound + 20.564% (representing claimed market value of mica to which CCC was entitled on 12/31/58).

C—Value of actual deliveries at prices prescribed in contract.

D—Market value of actual deliveries on 12/31/58.

E—Amount paid under letters of credit (column A minus column C).

F—Amount now claimed (column B minus the sum of columns D and E).

---

Our review of this phase of the case is limited by the fact that the parties agree that, if plaintiffs Asheville and Schwab prevail on their claims, the computation of the CCC's counterclaims will be different. Since we have remanded the case for further findings in the light of all the relevant evidence on this issue, it is obvious that we can make no final disposition of the counterclaims at this time. In order to expedite the consideration of this case at the lower court level, and by the parties in the event of any stipulation as to damages, we will say that we have considered the various defenses raised by the plaintiffs to the counterclaims as they now stand and find all but one of them without merit. Thus, we think the notice of breach given by CCC was timely, that the increase of 20.564% in average prices per pound used as the basis of the computation was reasonable under the evidence, and that CCC did not fail in any obligation it had to minimize damages. The one area where we think plaintiffs have

---

**3.** We believe that Judge Leibell erred in stating that CCC did not draw on the letters of credit for these amounts. If it did not, the counterclaims would have been substantially greater. See the table infra.

demonstrated error in this aspect of the judgment is that the District Court viewed the breach of section 2.b.(2) (a) on the basis of all the shipments of the two plaintiffs. In fact, a great many of these shipments had an average exchange value of $4.00 per pound—specifically 16,667.60 pounds in the case of Asheville, and 90,855.52 pounds in the case of Schwab. As to these shipments, there was certainly no breach, and we do not believe CCC sustained any loss on them. Under its theory, the CCC would obtain damages in respect to shipments which satisfied the contract's requirements. With regard to the remaining poundage, 6,405 for Asheville, and 43,766.48 for Schwab, we would follow the CCC's method of computing damage, which results in a net counterclaim of $2,451.34 against Asheville and $18,254.-14 against Schwab. These were the sums originally claimed by CCC in the pretrial order, which was, however, later amended to the higher figures claimed.

Reversed and remanded for further proceedings consistent with this opinion.